Filed 9/16/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LEOPOLDO JORGE, JR.,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CULINARY INSTITUTE OF AMERICA,<br><br>        Defendant and Appellant. | A143545<br><br>(Sonoma County<br>Super. Ct. No. SCV 247676) |

Respondent Leopoldo Jorge, Jr. (Jorge) sued Almir Da Fonseca (Da Fonseca) and appellant Culinary Institute of America (Culinary Institute or Institute) for injuries sustained when he was struck by a car driven by Da Fonseca, a chef instructor employed by the Culinary Institute. Despite that Da Fonseca had finished his shift at the Culinary Institute and was driving home in his own car at the time of the accident, a jury found the Institute liable for Jorge's injuries on a theory of respondeat superior. The Culinary Institute moved for judgment notwithstanding the verdict on the ground there was no evidence supporting the jury's finding that Da Fonseca was acting in the scope of his employment at the time of the accident. More specifically, it argued that there was no evidence supporting application of the "required vehicle" exception to the "going and coming" rule and so it could not be vicariously liable for Da Fonseca's negligent conduct while he was commuting home from work. The trial court denied the motion.

The Culinary Institute appeals, again arguing that it cannot be liable to Jorge for injuries caused by Da Fonseca's negligence because there was no evidence that at the time of the accident Da Fonseca was acting within the scope of his employment. We agree, and we reverse.

1

# BACKGROUND

### The Accident and Jorge's Claims

On February 10, 2010, Da Fonseca drove his car to work to start his shift at the Culinary Institute's campus in St. Helena.  At the end of his workday, he left in his car, heading towards his home in Sebastopol.  As he was driving down Calistoga Road, he struck two pedestrians, 14-year-old Jorge and his then girlfriend.

Jorge, through his guardian ad litem, filed a complaint for negligence against Da Fonseca.  A first amended complaint added a claim against the Culinary Institute based on a respondeat superior theory.[1]

### The Motion for Summary Judgment

On July 20, 2012, the Culinary Institute moved for summary judgment on the ground that it could not be vicariously liable under the respondeat superior doctrine for damages caused by Da Fonseca's negligent conduct, because he was not acting in the scope of his employment at the time of the accident.  The trial court denied the motion in an order that stated in its entirety:

"Defendant Culinary Institute of America's motion for summary judgment is hereby denied.  However thin the evidence, there remains a triable issue of fact as to the issue of whether Defendant Da Fonseca was in the course and scope of his duties for Defendant Culinary Institute of America when the accident occurred.

" 'The *respondeat superior* doctrine is to be given a broad application as the Supreme Court explained in *Farmer's Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992.  "For example, the fact that an employee is not engaged in the ultimate object of his employment at the time of his wrongful act does not preclude attribution of liability to an employer.'  Thus, acts necessary to the comfort, convenience, health and welfare of the employee while at work, though strictly personal and not acts of service, do not take the employee outside the scope of employment.  Moreover, 'where the

---

[1] The first amended complaint also added a premises liability claim against the city of Santa Rosa, with the premises liability allegations amended in a second amended complaint.  Jorge later dismissed the city of Santa Rosa.

employee is combining his own business with that of his employer, or attending to both at substantially the same time, no nice inquiry will be made as to which business he was actually engaged in at the time of the injury, unless it clearly appears that neither directly nor indirectly could he have been serving his employer.' *Jeewarat v. Warner Bros. Entertainment, Inc.* (2009) 177 Cal.App.4th 427, 434.

"Whether there is an exception to the 'going and coming' rule remains, as do consideration of the other salient parameters of *respondeat superior* as they relate to this case, the province of factual determination by a jury. However[] stretched and tortured the logic of the 'dirty uniforms' and chef's knives may be, these factors cannot be ruled out as a matter of law."[2]

**Trial**

Prior to the commencement of trial, the court ordered the issues of liability and damages bifurcated, with the issues of negligence and vicarious liability tried first.

The first phase of trial began on July 11, 2014. At the conclusion of closing arguments, the Culinary Institute moved for a directed verdict on the ground Jorge failed to present sufficient evidence to support his respondeat superior theory. The court denied the motion, ruling that the application of the required vehicle exception remained a question of fact for the jury.

During jury instructions, the jury was instructed on the going and coming rule and the required vehicle exception. Specifically, the court instructed: "In general, an employee is not acting within the scope of employment while traveling to and from the workplace, but if an employer requires an employee to drive to and from the workplace so that the vehicle is available for the employer's business, then the drive to and from

---

[2] Jorge also moved for summary adjudication, arguing that as a matter of law Da Fonseca was acting in the scope of his employment at the time of the accident because the going and coming rule did not apply where he used his car for consulting work and to commute to the St. Helena campus. The court denied the motion, concluding that "there remain questions of material facts that should properly go before a jury." Jorge filed a petition for writ of mandate, which we denied. (*Jorge v. Superior Court* (2014) No. A142182.)

3

work is within the scope of employment.  The employer's requirement may be either express or implied.

"The drive to and from work may also be within the scope of employment if the use of the employee's vehicle provides some direct or incidental benefit to the employer. There may be a benefit to the employer if, one, the employee has [agreed] to make the vehicle available as an accommodation to the employer, and two, the employer has reasonably come to rely on the vehicle's use and expect the employee to make it available regularly.  The employer's agreement may be either expressed or implied."[3]

The jury was also instructed on the transport of an employee's tools, as follows: "The fact that an employee took his or her tools home every night, does not make the use of his or her car a condition of employment or constitute such a special advantage or service to his or her employer as to extend the employment relation off the job site."

On August 1, the jury reached a verdict in the liability phase of the trial, finding that Da Fonseca was negligent and that he was acting within the scope of his employment by the Culinary Institute when he injured Jorge.  The jury found that Jorge was not negligent.

After the verdict on liability, Jorge settled his action against Da Fonseca for $30,000, resulting in Da Fonseca's dismissal.  The damage phase thus proceeded only as to the Culinary Institute, and on August 19, the jury awarded Jorge $885,083.

On September 4, the court entered judgment to that effect, and notice of entry of judgment was filed the following day.

**The Motion for Judgment Notwithstanding the Verdict**

On September 19, the Culinary Institute moved for judgment notwithstanding the verdict, arguing that the evidence was insufficient to support the jury's finding that Da Fonseca was acting in the scope of his employment at the time of the accident.  The court denied the motion.

---

[3] This instruction was based on CACI No. 3725, which was revised effective June 2014, the month before trial commenced.

4

The Culinary Institute appeals from the judgment and the denial of its motion for judgment notwithstanding the verdict.

## EVIDENCE AT TRIAL

### Da Fonseca and the Culinary Institute

The Culinary Institute is a non-profit culinary educational institute with its main campus in New York City and branches in St. Helena (known as Greystone) and other locations. It offers a two-year associate degree program and provides educational opportunities in the culinary arts to students, professional chefs, and other clients, including businesses, schools, universities, public and private companies, wineries, and more.

Da Fonseca is a native of Brazil. His culinary experience includes work as a chef instructor at the Cordon Bleu and as an executive chef at some of the top restaurants in San Francisco. He successfully competed in food competitions for many years and also travelled to Brazil multiple times to research manioc, a starch made by leaching and drying the root of the cassava plant.

Da Fonseca was hired as a chef instructor by the Culinary Institute in 2007. During the hiring process, he interviewed with Charles Henning, managing director of the Institute, and Adam Busby, supervisor of the Institute's chef instructors (including Da Fonseca).

### The Day of the Accident

On the morning of February 10, 2010, Da Fonseca drove his car to the St. Helena campus and parked in the school parking lot. He taught classes that day, working from approximately 6:15 a.m. to 5:30 p.m.

When Da Fonseca left the St. Helena campus that evening, he drove his car towards his home in Sebastopol, with one or two dirty chef's jackets and possibly a set of chef's knives in the car with him. As he was driving down Calistoga Road, he struck two pedestrians, one of whom was 14-year-old Jorge.

5

**Da Fonseca's Teaching Duties in the Associate Degree Program**

Da Fonseca's primary duty as a chef instructor at the Institute was to teach courses in the associate degree program, which chef instructors taught in three-week blocks. The classes were taught in two shifts: the morning shift, for which Da Fonseca would arrive between 6:00 a.m. and 6:30 a.m. and finish around 6:30 p.m., and the afternoon shift, for which he would arrive around 11:00 a.m. and finish around 9:15 p.m. Da Fonseca would arrive before class started to prepare his lessons, and would stay after class ended to meet with students and complete his work. He did not take work home with him. As Da Fonseca was a professional instructor, the Culinary Institute did not dictate to him when he was supposed to arrive, what he was supposed to do, when he was supposed to leave, or where he went. Rather, he had the freedom in his professional capacity to make those determinations. Da Fonseca accommodated his employer with regard to his work schedule, and his schedule sometimes changed based on the needs of the students and the school.

Da Fonseca used his personal vehicle to commute to the St. Helena campus. However, he could have carpooled to work if another chef instructor lived near him, his wife could have driven him to work, or he could have taken public transportation. Busby and Henning did not know whether Da Fonseca brought his personal vehicle to work at the St. Helena campus as they had no reason to know. Da Fonseca was paid hourly, but his pay did not include the commute time between the St. Helena campus and his home in Sebastopol.

Da Fonseca was never asked to have his car available during the day and did not make any accommodations to have his car available for the Culinary Institute. He did not need to have his personal vehicle on campus, as chef instructors were not expected to drive their personal vehicles. The Culinary Institute did not have any policies pertaining to the use of personal vehicles, and no one ever told Da Fonseca that a car was required for any of his job duties.

6

If an instructor wanted to arrange a field trip with students, the Culinary Institute had vans with drivers available to chef instructors. Drivers of the vans required a special license, and the chef instructors were not authorized to drive the vans.

**Da Fonseca's Additional Duties at the Culinary Institute**

In addition to its regular classes, the Culinary Institute offered many specialized classes that were also taught by the chef instructors. For example, it offered catalog classes, which were "basically continuing education [for] professional chefs." Such a class could be in the morning or afternoon, and during the week or on the weekend. Sometimes the catalog classes were about a very specific subject in which Da Fonseca had expertise, and the Culinary Institute would have him teach that class.

The Culinary Institute also held customer classes on Saturday for food enthusiasts who wanted to learn "from the best." According to Henning, the chefs liked to teach those classes because they could make extra money—and the classes were fun.

In addition to teaching classes, chef instructors could also help the Culinary Institute host a variety of on- and off-campus events, conferences, and retreats for students, chefs, the food industry, and the public. Some of the events were held on weekends, allowing chef instructors the option of picking up extra shifts. Although participation in off-campus events was voluntary, chef instructors usually chose to work at these special events if they were not also scheduled to be teaching a course.

For example, the Culinary Institute hosts an annual Latin Flavors conference in San Antonio, and every year Da Fonseca volunteered to attend. It also hosts a three-day retreat for physicians and an annual three-day Worlds of Flavor event for professional chefs and media from around the world. Other institute activities include the annual retreat for the North American Association of Food Equipment Manufacturers' and an annual competition for up and coming chefs sponsored by San Pellegrino.

Besides its curriculum, conferences, competitions, and retreats, the Culinary Institute has a consulting arm. When a business, such as a food producer or retailer, asks the Culinary Institute for consulting services, like creating a recipe, the chef instructors provide the services. Henning testified that the Culinary Institute accepted more

7

consulting work if it had the available people and less consulting work if it did not have the resources. While the Institute is a not-for-profit entity, it uses the consulting money it earns to cover its costs.

Consulting, like attending the conferences, was not a required employment duty, but was available to instructors based on expertise and availability. Busby testified that the chef instructors who were available to travel off campus did the consulting work. He had 17 chef instructors to draw from, and Da Fonseca liked to travel. According to Henning, the Culinary Institute assigned the consulting work to its chef instructors based on their abilities, knowledge, and expertise.

Consulting clients met with chef instructors at the St. Helena campus or at the client's business. The particular client's facility operation hours determined the hours the chef instructor worked.

Between 2007 and the date of the accident, Da Fonseca did consulting projects on behalf of the Culinary Institute and presented at conferences, retreats, summits, and international culinary conferences, both on and off campus. His consulting work included the following clients: Mezzetta, Blue Diamond Almonds, Young Corporation, University of San Diego, Olive Garden, Harris Ranch, Stanford University, Rich's Food Products, and the USA Dry Pea and Lentil Council. Da Fonseca's timesheets confirmed that from January 2009 to the date of the incident in February 2010, he did consulting work for "Rutgers," "Mezzetta," "Canola info/trade show," "Sonic" and "Sonic & Coke," "BSH," "Diamond Foods," "USD" (University of San Diego), "USA D.P.L. & C.," and "PJB Demo."

In the month of the accident alone (February 2010), Da Fonseca worked two hours consulting with Mezzetta. He also worked eight hours on Saturday, February 6, at an American Culinary Federation convention doing a demonstration, and he worked nine hours on Sunday, February 7, doing hands on training for the North American Association of Food Equipment Manufacturers. On his time sheet, Da Fonseca coded this weekend work to the Culinary Institute's consulting department.

In the month prior to the accident, in addition to traveling and teaching, Da Fonseca spent 14 hours doing education and office class work, and two hours doing conference work for the Culinary Institute's and Harvard School of Public Health's World of Healthy Flavors (WOHF) invitational leadership retreat. He worked eight hours preparing for the retreat, and worked 24 regular-time hours, nine and one-quarter overtime hours, and one-and-a-half double-time hours for WOHF. He also worked eight regular-time hours, as well as an unclear number of overtime hours, on Saturday, January 23, for the Culinary Institute's Produce First retreat.

In addition to the above responsibilities, Da Fonseca did research for the Culinary Institute. Henning testified that the Institute approved Da Fonseca's project to conduct research in Brazil for several weeks on manioc, a food staple for Africa and South America. The Institute paid his salary while he was in Brazil, and subsequently promoted his research findings because the culinary and food industry was interested in knowing what the Institute had potentially discovered or what it could "bring to the table."

**Da Fonseca's Travel on Behalf of the Culinary Institute**

Henning testified that some of the chef instructor's work activities might require travel. Asked whether there was a limit as to how many hours within a certain timeframe a chef instructor could travel, he testified the Culinary Institute did not have a maximum limit, or a minimum requirement. It was a question of availability: if the Institute had the "manpower" allowing a chef instructor to go on a consulting assignment for three or four weeks, and scheduling and staffing permitted, the instructor was permitted to go. The Culinary Institute paid chef instructors for the time they were on-site at a consulting event, which sometimes resulted in overtime.

Between 2007 and 2010, Da Fonseca chose to travel off-campus on behalf of the Culinary Institute. While travel was optional for chef instructors, he enjoyed traveling and volunteered for consulting jobs and special events when he was available. He also volunteered to work at and attend conferences, both on and off campus.

In the less than three years prior to the February 10, 2010 accident, Da Fonseca spent over 150 days[4] working off-campus, with each successive year involving more travel. The off-campus locations to which Da Fonseca traveled included two different countries, seven different states, and six different cities (and an air force base) in California. For example, in the weeks preceding the accident, Da Fonseca spent a day travelling to Rutgers University in New Jersey, where he worked for five days doing consulting work. Next, he spent a day travelling to the Culinary Institute's Hyde Park, New York campus, where he spent two days working on curriculum. He then spent one day travelling home.

Da Fonseca testified that he was sometimes paid for his travel time. If a trip involved a substantial amount of travel, he was compensated for the travel time; if it was one or two hours, he would not be.

In response to requests for admissions, Da Fonseca admitted he was entitled to reimbursement for his mileage when he drove to work locations away from the Greystone facility. He also admitted that the Culinary Institute paid him for his travel time when he travelled on behalf of the Culinary Institute anywhere other than the Greystone facility.

When Da Fonseca traveled off campus in his car, he was also reimbursed for his mileage, and parking expenses, expenses that were ultimately paid for by the consulting client. To reimburse chef instructors for travel-related expenses, the Culinary Institute used a preprinted expense report. The form contained spaces for employees to specify whether their expenses were budgeted, the dates of their travel, the "Foreign Currency Conversion Rate (if applicable)," the purpose for the travel, whether an "Outside Organization" was reimbursing expenses, and, if applicable, the name of the organization. Da Fonseca submitted expense reimbursement forms for his mileage, and so long as he was conducting business, the Culinary Institute would reimburse him for his

---

[4] Jorge's respondent's brief says 153 days; at oral argument his counsel represented it was 178 days.

10

mileage. He could not recall how many expense reimbursements he had submitted to his employer, but admitted it could be "many."

**Da Fonseca's Use of His Personal Vehicle**

If a chef instructor was going to travel, Busby did not tell the instructor what mode of transportation to use. For local travel on consulting trips, the chef instructor could choose to rent a car, take public transportation, carpool, or take a personal vehicle. According to Busby, "It was up to the instructor how they got from point A to point B. It wasn't up to me to decide. It was up to them." For example, if Da Fonseca needed to travel to Stanford and decided to rent a car, the Culinary Institute would reimburse him for that expense.

Henning testified that a personal vehicle was not required for consulting jobs. He further testified that the Culinary Institute had no policies in place for its employees who used their personal cars for work. The Culinary Institute did not require proof of a valid driver's license or of auto insurance, nor did it do a DMV background check (although it did do a full background check, so if a prospective employee had an arrest for driving under the influence, it would show up).

If a trip required a flight, the Culinary Institute would provide the flight information. But Busby and Henning did not control—or even know—how the instructor got to the airport. An instructor could take a shuttle or a taxi.

Da Fonseca testified that for shorter trips, he would drive himself to the airport. On longer trips, he usually took an airport shuttle or asked his wife to take him, as she did on many occasions. If he flew out of San Francisco, he would make his own way to the airport, either by driving his own car or taking an airport shuttle. When he went on a research trip to Brazil, for example, Da Fonseca took the Airporter from Santa Rosa to the airport. He testified that the Culinary Institute never asked or required him to drive his car to the airport when he traveled, explaining, "No. That's—you know, we just need to get there. How we get there is our own responsibility."

Da Fonseca never had a conversation with anyone at the Culinary Institute about using his personal car to participate in consulting work. Nobody told him how to get

11

where he was going when he was doing a consulting job.  Da Fonseca acknowledged that he used his car on "many occasions" to get to off-campus jobs, driving for example, to Travis Air Force Base, University of California at Davis, Coalinga, Fresno, and Palo Alto.  He drove to the San Francisco International Airport when he was invited to speak at a three-day conference in Seattle, taught a four-day class to the chefs from the food operation of Ohio State University, went to Texas for a three- or four-day conference, and went to other Culinary Institute campuses.

Da Fonseca testified no employee retained as a driver for the Culinary Institute ever drove him to meet with the Institute's clients.  He sometimes rode in a Culinary Institute van when he took a field trip with his students, but the Institute did not authorize him to drive any of its vehicles.  And when he was travelling, he did not use the Institute's vans.

In response to requests for admissions, Da Fonseca admitted that the Culinary Institute had not authorized him to drive an institute-owned vehicle; that he never drove an institute-owned vehicle; and that no employee retained as a driver for the Culinary Institute ever drove him to meet with any clients (excluding class field trips.)

Da Fonseca testified that he was never transported in the van to a consulting job.  The court asked Da Fonseca if the Culinary Institute van would drive just one person to a conference or event.  Da Fonseca was not sure, testifying, "I never took a [Culinary Institute] vehicle, but you know, other people have, so I am not sure."  By this, he meant that he never took an Institute van by himself, although he had travelled in it for field trips.

Busby did not recall an institute-owned vehicle ever transporting Da Fonseca off site from the St. Helena campus.  According to Busby, it would have been unreasonable for the Culinary Institute to use a 20-person van to transport Da Fonseca to a consulting job in Coalinga.

**The Culinary Institute's Promotion of Its Chef Instructors' Experiences**

The Culinary Institute told the world about its chef instructors' experience for consulting services, seminars, and conferences.  Da Fonseca testified, for example, that

the Culinary Institute incorporated his research in Brazil into its programs, including the Latin Flavors program. As he described it, his Brazil research project on manioc was going to help humanity because people with celiac disease could eat it. He had studied this root more than anyone else had, and it was important research. He testified the Culinary Institute's "bio" for him said he travelled extensively in South America documenting indigenous ingredients and traditional culture, and was a frequent presenter at international culinary summits and conferences. And he admitted potential Culinary Institute clients might see his faculty "bio."

When Da Fonseca taught at conferences, like the Latin Flavors conference in San Antonio, there would be a "bio" about him in the brochure so people would know about him and his experience. He acknowledged the Culinary Institute shared his information in order to promote its conferences, summits, and seminars. To the extent he became a better instructor, it provided benefit to the Institute because the better he was as an instructor, the better service he could provide to its students. As Henning described it, the "quality of the curriculum, the quality of education provided to our students depends on the quality of [our] faculty."

**Tools of the Trade: Chef's Knives and Jackets**

Like most chef instructors, Da Fonseca owned a personal set of knives, which he used in his teaching, at off-site Culinary Institute events, and for personal use. The Culinary Institute also has sets of knives available on campus. Da Fonseca sometimes left his knives on campus, but often brought them home with him for safe keeping. He testified that he could not recall if his knives were in his car on the day of the accident. In response to a request for admission, however, Da Fonseca admitted that at the time of the accident, he was travelling with his chef's knives.

Henning testified the Culinary Institute did not "require" chefs to take their own knives when they travelled, but acknowledged that they did. He also testified the Institute did not provide knives to their chef instructors and expected them to use their own knives.

13

Chef instructors wear chef's jackets with the Culinary Institute logo when they work at, or on behalf of, the Culinary Institute. The Institute provided the instructors with jackets (Da Fonseca had 10 to 12 at the time of the accident) and paid for instructors to have their jackets laundered at Klass Cleaners in St. Helena. Instructors were free, however, to launder their jackets at a different dry cleaner or to launder them at home.[5] Instructors were not required to use their own car to drop off their chef's jackets.

When Da Fonseca first started working at the Culinary Institute, his wife laundered his jackets for him. At the time of the accident, he was having them laundered at Klass Cleaners. He would leave his dirty jackets in his car at the end of each day and, after accumulating four or five jackets, would drop them off on his way to or from work, about once a week. At the time of the accident, he had one or two chef's jackets in his car.

To get to Klass Cleaners, Da Fonseca would leave the Culinary Institute, take a right, and drive into downtown St. Helena. To get home, he would leave Klass Cleaners, take a left, and go back past the Institute and through Calistoga to get to his home in Sebastopol. Klass Cleaners was in the opposite direction from the route he travelled to and from work. It was undisputed that Da Fonseca was not on his way to Klass Cleaners on the day of the accident.

Da Fonseca testified that he always carried his chef's knives and jackets with him when he travelled back and forth to the St. Helena campus and to other locations where he did consulting, seminars, conferences, or summits.

### DISCUSSION

#### A. Standard of Review

"The trial court's power to grant a motion for judgment notwithstanding the verdict is the same as its power to grant a directed verdict. (Code Civ. Proc., § 629.) 'A

___

[5] Da Fonseca testified that the Institute would reimburse chef instructors if they used a different cleaner, while Henning testified that it would not.

motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support.' [Citations.] On appeal from the denial of a motion for judgment notwithstanding the verdict, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict. [Citations.] If there is, we must affirm the denial of the motion. [Citations.]" (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138; accord, *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68 ["As in the trial court, the standard of review is whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion."].) For evidence to be substantial, it must be of ponderable legal significance, reasonable, credible, and of solid value. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.) The "focus is on the quality, not the quantity, of the evidence." (*Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 871.) We resolve all evidentiary conflicts and indulge all reasonable inferences in support of the judgment. (*Leung v. Verdugo Hills Hospital* (2012) 55 Cal.4th 291, 308.)

### B. Respondeat Superior: An Employer's Liability for Torts of Its Employees

### 1. General Principles Governing Respondeat Superior

Under the theory of respondeat superior, an employer is vicariously liable, irrespective of fault, for the tortious conduct of its employees within the scope of their employment. (*Diaz v. Carcamo* (2011) 51 Cal.4th 1148, 1154; *John Y. v. Chaparral Treatment Center, Inc.* (2002) 101 Cal.App.4th 565, 574.) This doctrine is based on " 'a deliberate allocation of a risk. The losses caused by the torts of employees, which as a practical matter are sure to occur in the conduct of the employer's enterprise, are placed upon that enterprise itself, as a required cost of doing business. They are placed upon the employer because, having engaged in an enterprise which will, on the basis of past experience, involve harm to others through the torts of employees, and sought to profit by it, it is just that he, rather than the innocent injured plaintiff, should bear them; and

15

because he is better able to absorb them, and to distribute them, through prices, rates or liability insurance, to the public, and so to shift them to society, to the community at large.' " (*Hinman v. Westinghouse Elec. Co.* (1970) 2 Cal.3d 956, 959–960 (*Hinman*), quoting Prosser, Law of Torts (3d ed. 1964) p. 471; accord, *Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 304 [policy goals of the doctrine are "preventing future injuries, assuring compensation to victims, and spreading the losses caused by an enterprise equitably"]; *Farmers Ins. Group v. County of Santa Clara*, *supra*, 11 Cal.4th at p. 1004 ["central justification for respondeat superior" is that "losses fairly attributable to an enterprise—those which foreseeably result from the conduct of the enterprise—should be allocated to the enterprise as a cost of doing business"].)

### 2. The Going and Coming Rule

While an employer's vicarious liability for the torts of its employees is well established, courts have recognized that an employee's commute "to and from work is ordinarily considered outside the scope of employment so that the employer is not liable for [the employee's] torts" committed during the employee's commute. (*Hinman, supra,* 2 Cal.3d at p. 961; *Anderson v. Pacific Gas & Electric Co.* (1993) 14 Cal.App.4th 254, 258 (*Anderson*) [employee is not acting within the scope of employment when going to or coming from his or her place of work]; *Tryer v. Ojai Valley School* (1992) 9 Cal.App.4th 1476, 1481 (*Tryer*) [employer is generally not responsible for torts committed by an employee who is going to or coming from work].) This rule, commonly referred to as the "going and coming rule," is grounded in the notion that " 'the employment relationship is "suspended" from the time the employee leaves until he returns [citation], or that in commuting he is not rendering service to his employer [citation].' [Citations.]" (*Tryer, supra,* 9 Cal.App.4th at p. 1481, quoting *Hinman, supra,* 2 Cal.3d at p. 961; *Baptist v. Robinson* (2006) 143 Cal.App.4th 151, 162 [employee is not ordinarily rendering a service to the employer while commuting]; *Blackman v. Great American First Savings Bank* (1991) 233 Cal.App.3d 598, 602 (*Blackman*) ["employment relationship is suspended from the time the employee leaves his place of work until he returns"].)

16

### 3. The Required Vehicle Exception to the Going and Coming Rule

There are several exceptions to the going and coming rule, however, that if applicable will result in an employer being liable for its employee's tortious conduct that occurs during the commute. (*Ducey v. Argo Sales Co.* (1979) 25 Cal.3d 707, 722 (*Ducey*); see also *Santa Rosa Junior College v. Workers' Comp. Appeals Bd.* (1985) 40 Cal.3d 345, 352 [going and coming rule is " 'riddled with exceptions' "].) These exceptions typically arise "where the trip involves an incidental benefit to the employer, not common to commute trips by ordinary members of the work force." (*Hinman, supra,* 2 Cal.3d at p. 962; *Hinojosa v. Workmen's Comp. Appeals Bd.* (1972) 8 Cal.3d 150, 157 (*Hinojosa*); *Blackman, supra,* 233 Cal.App.3d at p. 602.) But this means not just any trivial benefit to the employer, but a benefit "sufficient enough to justify making the employer responsible for the risks inherent in the travel." (*Blackman, supra,* at p. 604.)

The applicability of one such exception—the required vehicle exception—is at the heart of this case.

The required vehicle exception[6] was first recognized in *Smith v. Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 814 (*Smith*), a case involving a claim for worker's compensation benefits when a county social worker was fatally injured in a single-car accident while driving to work. His widow's request for worker's compensation benefits was denied on the ground her husband's death did not arise out of his employment since he was not acting in the course of his employment on his drive to work, as per the going and coming rule. Her attempts to obtain reversal by the Workmen's Compensation Appeals Board and the Court of Appeal were unsuccessful. (*Id.* at p. 815.)

But the widow had success in the Supreme Court, where she urged the court to recognize an exception to the rule where the employee was bringing his car to work as required by his employer. (*Smith, supra,* 69 Cal.2d at p. 816.) It did, and reversed. The evidence established that the social worker was required to furnish his own car so that he

---

[6] The CACI instruction refers to this exception as the "vehicle-use" exception. (CACI No. 3725.) Consistent with case law, we shall refer to it as the required vehicle exception.

17

could visit his clients on field days and would be available to see clients in cases of emergency on regular office days. While there were cars available if requested in advance by a worker whose car had broken down, the deceased employee had never requested the use of a county car. According to the Supreme Court, this evidence compelled the conclusion that the employer required the decedent to bring his car to work on the morning of the accident. (*Ibid.*) And since he furnished his own car for the sake of fulfilling his employment obligations, the commute came within the course of his employment. (*Id.* at p. 825.)[7]

In *Hinojosa, supra,* 8 Cal.3d 150, an operator of several non-contiguous ranches employed Miguel Hinojosa as a farm laborer. Hinojosa would work at one ranch until completion of the work, at which time the foreman would assign him to a different ranch. He was required to provide his own transportation "not only to get to the fields but for the variable inter-ranch transit necessary to perform the day's work." (*Id.* at p. 152.) Hinojosa did not own a car of his own, so he paid another worker for a ride to and from

---

[7] As noted, *Smith* involved a worker's compensation claim, rather than a tort claim. The tests for determining whether an employee was acting within the course and scope of employment in these two contexts are different, a difference attributable to the purpose of each claim. While both have the goal of compensating injured victims, "[w]orkers' compensation and respondeat superior law are driven in opposite directions based on differing policy considerations. Workers' compensation has been defined as a type of social insurance designed to protect employees from occupational hazards, while respondeat superior imputes liability to an employer based on an employee's fault because of the special relationship. [Citation.]" (*Blackman, supra,* 233 Cal.App.3d at p. 605; accord, *Munyon v. Ole's, Inc.* (1982) 136 Cal.App.3d 697, 702.)

Because Labor Code section 3202 directs that the provisions of the Workers' Compensation Act are to be construed liberally, "courts have tended to be very generous in finding injured workers are entitled to workers' compensation benefits. [Citation.]" (*Anderson, supra,* 14 Cal.App.4th at p. 260.) On the other hand, scope of employment for respondeat superior purposes is more restrictive. (*Hartline v. Kaiser Foundation Hospitals* (2005) 132 Cal.App.4th 458, 468.) Despite this distinction, in developing the respondeat superior doctrine, "courts have occasionally looked toward workers' compensation cases for guidance. [Citations.]" (*Bailey v. Filco, Inc.* (1996) 48 Cal.App.4th 1552, 1562; *Ducey, supra,* 25 Cal.3d at p. 722 [California courts often cite tort and workers' compensation cases interchangeably in going and coming cases].)

18

work and between the farms during the day. (*Id.* at pp. 152–153.) On his way home one day, the car in which he was riding was involved in an accident, injuring him. (*Id.* at p. 153.)

A referee awarded Hinojosa worker's compensation benefits. The appeals board vacated the award on the ground the going and coming rule barred his claim. (*Hinojosa, supra,* 8 Cal.3d at p. 153.) The Supreme Court reversed, concluding that *Smith* controlled: "The necessity for the use of a car to go from one to another of his clients in the case of the social worker in *Smith* is no different than the necessity for the use of a car to go from one to another of the employer's separate ranches in the instant case." (*Id.* at p. 161.) And the court further explained: "To get from one contiguous field to another within the work day *required* the use of automobile transport. Since the employer furnished no such private transport the employer in effect imposed the requirement that the employees themselves procure such transport in the form of cars driving to and from work each day to one of the seven or eight fields designated by the foreman." (*Id.* at pp. 161–162.)

Meanwhile, shortly before *Hinojosa*, the Court of Appeal filed *Huntsinger v. Glass Containers Corp.* (1972) 22 Cal.App.3d 803 (*Huntsinger*), the first case to apply *Smith*'s required vehicle exception to a claim that an employer was vicariously liable for the negligence of its employee.[8] There, Edward Fell was a service representative whose principal duties included daily contact with customers, both by telephone and in person. On some occasions, Fell would leave home and call on customers prior to driving to the company office; on others, he would call on customers on the way home. And sometimes, he would carry objects connected with company business with him. In carrying out these duties, Fell extensively drove his personal pickup truck, although there was an indication that, at some times, a rental car used by another employee might have been available for his use. (*Id.* at p. 806.) One evening, while driving his truck from the

---

[8] An earlier case, *Harris v. Oro-Dam* (1969) 269 Cal.App.2d 911, had discussed *Smith*, but in the context of analysis of a "travel expenses" exception to the going and coming rule.

19

office to his home, Fell collided with a motorcycle, killing motorcyclist Huntsinger. Huntsinger's survivors sued for wrongful death, naming Fell's employer as a defendant. The trial court granted a nonsuit on the ground that Fell was not acting within the scope of his employment at the time of the accident. (*Id.* at pp. 806–807.) The Court of Appeal reversed, holding there was "ample evidence from which the jury might have concluded that Fell's use of his vehicle was an implied or express condition of his employment." (*Id.* at p. 806.)

Since *Huntsinger,* a handful of cases have discussed the issue of the required vehicle exception in the tort context—not one of which has a holding supporting Jorge's verdict here.

*Ducey, supra,* 25 Cal.3d 707, is illustrative. Dolores Glass, an employee of Argo Sales Co. (Argo Sales), was involved in a head-on collision, resulting in fatal injuries to herself and serious injuries to the Duceys, the occupants of the other car. The Duceys sued Glass's estate and Argo Sales, among others. A jury found in favor of the Duceys against the estate but absolved Argo Sales of any liability for Glass's negligence. The Duceys appealed, arguing that the trial court erred in submitting the issue of Argo Sales's liability to the jury, because the evidence established as a matter of law that Glass was acting in the scope of her employment at the time of the accident. (*Id.* at p. 711.) Our colleagues in Division Four rejected the Duceys' position, and affirmed, and the Supreme Court adopted their opinion. (*Id.* at p. 721.)

As described in the opinion, the evidence was as follows: "Glass had been employed by Argo Sales for almost 20 years to clean model homes at various locations in San Jose, Alameda and Union City and . . . she regularly drove up to 45 miles from her residence to such model homes several days a week; the accident in this case occurred when Glass was returning home after performing her job. Although plaintiffs introduced evidence that on occasion Glass carried some cleaning equipment in her car, and at times traveled by car to pick up small furnishings for the model homes, there was no evidence that Argo Sales required Glass to do so; Argo Sales introduced evidence demonstrating that it had never reimbursed Glass for commuting expenses and did not pay her for the

20

time she spent driving to work." (*Ducey, supra,* 25 Cal.3d at p. 714.) Based on that, the court concluded, "The evidence does not establish as a matter of law that the company required Glass, as a condition of her employment, to commute to work in her personal car. The job was not one that embraced driving, and Glass was not required to use her vehicle for field work. Although there was evidence that she occasionally ran errands for her employer, these trips were not conclusively shown to be a condition of her employment. The jury could reasonably have believed that Glass was acting as a volunteer in running occasional errands for replacement items. She was not engaged in such an errand at the time of the accident. There is no evidence that Glass was required to go from location to location during the day. [Citation.]" (*Id.* at p. 723.)

*Tryer, supra,* 9 Cal.App.4th 1476, is similar—Lorraine West was employed by the Ojai Valley School to feed its horses twice a day at its two campuses during two work shifts. She was not paid for travel time to or from work or for travel expenses. West was involved in an accident on her way to her afternoon shift after leaving campus to ride her own horse and eat her lunch at a ranch. In a lawsuit brought by the survivors of the victim of the accident, the trial court granted summary judgment for the school on the ground that West was not engaged in the scope of her work when the accident occurred. (*Id.* at pp. 1479–1480.)

The Court of Appeal affirmed, agreeing there was no evidence supporting the application of the required vehicle exception because West merely commuted between two designated school campuses and was never required to use her vehicle for company errands during work hours. It found *Smith*, *Hinojosa*, and *Huntsinger* all distinguishable "because they all require the use of a vehicle as an integral part of performing the job at disparate locations throughout the course of work hours." (*Tryer, supra,* 9 Cal.App.4th at pp. 1482–1483.) As *Huntsinger* summed up the rule: "[W]hen a business enterprise requires an employee to drive to and from its office *in order to have his vehicle available for company business during the day*, accidents on the way to or from the office are statistically certain to occur eventually, and, the business enterprise having required the

21

driving to and from work, the risk of such accidents are risks incident to the business enterprise." (*Huntsinger, supra,* 22 Cal.App.3d at p. 810, italics added.)

These holdings are the bases for the CACI instruction, the first paragraph of which tells the jury that the drive to and from work is within the scope of employment if the "employer requires [the] employee to drive to and from the workplace so that the vehicle is available for the employer's business," and the second paragraph, that the drive may be if "the use of the employee's vehicle provides some direct or incidental benefit to the employer" and "there may be a benefit to the employer if, one, the employee has [agreed] to make the vehicle available as an accommodation to the employer, and two, the employer has reasonably come to rely on the vehicle's use and expect the employee to make it available regularly."

In light of this law, we turn to the question here: was there substantial evidence supporting the jury's finding that Da Fonseca was acting in the scope of his employment at the time he struck Jorge?

### C. Jorge Presented No Evidence from Which the Jury Could Conclude that Da Fonseca Was Acting Within the Scope of His Employment at the Time of the Accident

It was undisputed that at the time of the accident Da Fonseca was commuting home from the Culinary Institute's St. Helena campus. As such, the going and coming rule would typically bar a vicarious liability claim against the Institute. To take his claim outside the rule, Jorge invoked the required vehicle exception, arguing at trial that the Culinary Institute required Da Fonseca to use his personal vehicle to accomplish his job duties. The jury agreed, finding that Da Fonseca was acting within the scope of his employment at the time of the accident. This finding is not supported by substantial evidence.

Under the required vehicle exception, the employer's requirement that an employee use a personal vehicle may be express or implied. (*Hinojosa, supra,* 8 Cal.3d at p. 161; *County of Tulare v. Workers' Comp. Appeals Bd.* (1985) 170 Cal.App.3d 1247, 1253; *Huntsinger, supra,* 22 Cal.App.3d at p. 807.) There was no evidence that the

22

Culinary Institute expressly required Da Fonseca to use his car for work purposes. Busby and Henning both testified that chef instructors were never told to use their private vehicles for any purpose. And Da Fonseca confirmed this, that he was never told he was required to use his car for any of his employment duties. Jorge did not present any evidence to the contrary. There was, in sum, no evidence of any express requirement. Or, we conclude, an implied requirement.

Da Fonseca did not need a car for any purpose on the days he fulfilled his regular chef instructor duties at the St. Helena campus. He testified that he commuted from home to the campus and back in his car as a matter of convenience, but he could have taken public transportation, carpooled, or been dropped off. Henning and Busby both testified that they did not know—and had no reason to know—how Da Fonseca arrived at the campus each day. Da Fonseca was not paid for his commute time to or from the campus. He was never required—indeed, never asked—to run errands on his way to or from the campus or during his work day. Simply, there was no evidence that during his on-campus work days, Da Fonseca was impliedly required to use his car to fulfill any of his work obligations.

Nor was there evidence—substantial or otherwise—Da Fonseca was impliedly required to use his car for the off-campus travel he did to conferences, retreats, seminars, or consulting jobs on behalf of the Institute. The evidence showed only that he used his personal vehicle *to get to and from* his off-campus commitments and that he could have used alternative means to get there. This is insufficient to take Da Fonseca's negligent conduct outside the scope of the going and coming rule, because the required vehicle exception applies only where the employer requires the employee to use his or her vehicle *to perform his or her work duties during the work day*, as *Smith, supra,* 69 Cal.2d 814, and *Huntsinger, supra,* 22 Cal.App.3d 803, confirm.

Here, unlike *Smith*, *Huntsinger*, or *Hinojosa*, and like *Ducey* and *Tryer,* there was no evidence Da Fonseca needed to use his car or have it be available *during* his work day in order to perform his duties.

23

The few cases relied on by Jorge are not to the contrary. *Lobo v. Tamco* (2010) 182 Cal.App.4th 297 (*Lobo*), heavily relied on by Jorge because of the employee's relatively infrequent use of the vehicle, held that the applicability of the required vehicle exception was a question for the jury. In that case, Luis Duay Del Rosario, an 16-year employee of Tamco, was driving home from work when he struck and killed Deputy Sheriff Daniel Lobo. (*Id.* at pp. 299, 301.) One of the requirements of Del Rosario's written job description was, if necessary, to visit customer facilities to answer complaints, obtain information, and maintain customer relations. (*Id.* at pp. 301–302.) Del Rosario testified that if a customer called with quality concerns, he and a sales engineer would go to the site, riding in the engineer's car. (*Id.* at p. 302.) On occasion, he would use his own car if no sales engineer was available. He had visited customer sites " 'very few' " times, using his own car fewer than 10 times. His supervisor testified that Del Rosario was required to use his personal car on the occasions where it was necessary to visit customers, and no company car was provided. (*Ibid.*)

Lobo's survivors filed wrongful death suits, naming Tamco as a defendant on a respondeat superior theory. Tamco moved for summary judgment, contending that the evidence established as a matter of law that Tamco was not vicariously liable for Lobo's death because Del Rosario was not acting within the scope of employment when he was commuting home. The trial court granted summary judgment. Plaintiffs appealed, and the Court of Appeal reversed. (*Lobo, supra,* 182 Cal.App.4th at pp. 299–300.) Doing so, the court noted that application of the required vehicle exception turned on "whether the employer expressly or implicitly required the employee to make the vehicle available or had reasonably come to expect that the vehicle would be available for work purposes and whether the employer derived a benefit from the availability of the vehicle. [Citations.]" (*Id.* at p. 303.) And, it further noted, the frequency of using the car for business purposes was not determinative: "Here, [the supervisor] testified that Tamco required Del Rosario to make his car available rather than providing him with a company car in part *because* the need arose infrequently. Thus, the availability of Del Rosario's car provided Tamco with both the benefit of insuring that Del Rosario could respond promptly to customer

24

complaints even if no sales engineer was available to drive him to the customer's site and the benefit of not having to provide him with a company car. Based on this evidence, a reasonable trier of fact could find that the 'required-vehicle' exception does apply." (*Ibid.*)

*Lobo* is distinguishable from the facts here in critical ways: Del Rosario was required to visit customer sites during his work day; no company car was provided for that purpose; and Del Rosario's supervisor testified that the employee was "required to use his personal car to discharge that duty." (*Lobo, supra,* 182 Cal.App.4th at p. 302.) There was no evidence here that Da Fonseca was required to use any car, let alone his own car, to accomplish his work duties during his work day. Where there is *no* evidence that the employee was required to have his or her car available during the work day, there is no question for the jury as to the applicability of the required vehicle exception.[9]

*Moradi v. Marsh USA, Inc.* (2013) 219 Cal.App.4th 886, the other tort case holding the required use exception applicable, is similarly inapposite. That case involved an employee of an insurance broker who was "required each workday to drive to and from the office in her personal vehicle," which she "had to use . . . to visit prospective clients." (*Id.* at p. 890.)

Jorge contends that there was "ample evidence" from which the jury could have found that Da Fonseca's automobile use was an implied condition of his employment. He makes much of Da Fonseca's off-campus work assignments, highlighting the extensive travel he did on behalf of the Culinary Institute. But *Anderson, supra,* 14 Cal.App.4th 254, dispensed with the notion that the need to show up for work at different sites rendered the employee's commute extraordinary—or for the benefit of the

---

[9] Indeed, it may be said that the case does not assist Jorge at all, as on remand the jury found the required vehicle exception inapplicable. (*Lobo v. Tamco* (2014) 230 Cal.App.4th 438, 440–441 [jury's finding that exception did not apply was supported by substantial evidence: employee's occasional use of personal vehicle for work was only for employee's own convenience and did not benefit employer, and employer never asked employee to use vehicle but merely sometimes acquiesced in employee's desire to do so].)

25

employer.  In *Anderson*, a lineman for Pacific Gas & Electric Company (PG&E) worked out of various locations.  He would report to work at a company point of assembly, traveling there in his own vehicle and then traveling on to various job sites in a company vehicle.  Per a union contract, he received a per diem travel allowance whenever he reported to a point of assembly more than 25 miles from his home.  At the time of the accident, he had finished work for the day, had traveled more than 25 miles from his home to the point of assembly, and had another PG&E employee in his car.  (*Id.* at pp. 256–257.)  Affirming summary judgment for PG&E based on the going and coming rule, the Court of Appeal concluded that the fact the employee reported to work at different, and constantly changing, remote locations did not make his regular commute to and from work part of his job or mean that he was acting within the course and scope of his employment during his trip home (even with a transportation allowance).  (*Id.* at p. 262.)

Jorge also argues that Da Fonseca's use of the Culinary Institute's travel expense form evidenced an implied requirement that he drive his personal vehicle for work purposes.  In Jorge's words:  "Although the [Culinary Institute] did not directly tell Mr. Da Fonseca how to get to the off-campus work [citations], the evidence shows it anticipated and expected he would do so by using his own car.  The [Culinary Institute's] own travel expense form stated that it reimbursed mileage for 'employee car only.'  Further, it knew early on in his employment that Mr. Da Fonseca was indeed using his car to travel to his off-campus work assignments because Mr. Da Fonseca submitted a travel expense form seeking reimbursement for his mileage in December of 2007 (seven months after starting employment) and the [Culinary Institute] reimbursed him."  But Da Fonseca's use of a travel expense form to seek reimbursement for miles traveled to an off-campus work site is not evidence of an implied requirement that he have his car available to fulfill his duties during the work day.  Indeed, by that logic, any time an employee drove a personal vehicle to an airport while traveling for work and subsequently sought reimbursement for the miles driven, the employer would be

26

vicariously liable for an accident caused by the employee while driving to his or her regular workplace on a different day. That is not the law.

Jorge also points to evidence that Da Fonseca was paid for travel time to and from off-campus events to support the jury's finding that Da Fonseca was acting in the scope of his employment at the time of the accident. While it is correct that an employee who was compensated for his or her travel time may be found to have been acting within the scope of employment during that travel (see generally *Hinman, supra,* 2 Cal.3d at p. 963), that is irrelevant here, since Da Fonseca's commute home when the accident occurred was not compensated.

While there was no evidence that Da Fonseca was impliedly required to drive his private vehicle as a condition of his employment, there was direct evidence that he was *not*: Henning, Busby, and Da Fonseca all testified that Da Fonseca was not required to use his private vehicle. As to his on-campus work commitments, Henning and Busby both testified that they did not know how Da Fonseca arrived at work each day because there was no reason for them to know. Da Fonseca testified that as an alternative to driving, he could have carpooled, been dropped off, or taken public transportation. As to off-campus commitments, Henning testified that a personal vehicle was not required, while Busby testified that a chef instructor could travel via a rental car, public transportation, carpool, or personal vehicle. And Da Fonseca testified that no one at the Culinary Institute dictated how he was to get to off-campus work commitments.

But even if there were substantial evidence that Da Fonseca was impliedly required to drive his car to off-campus events or that he agreed to make his car available for off-campus events as an accommodation to the Culinary Institute and the Institute came to rely on it—which there was not—there is no authority holding that such evidence took Da Fonseca's ordinary commute to and from the St. Helena campus outside the going and coming rule. In short, the accident here occurred when Da Fonseca was simply commuting home from a day of performing his regular duties as a chef instructor at the St. Helena campus, a commute that lacked any imaginable connection to the performance of his duties at the Culinary Institute.

27

Finally, Da Fonseca's use of his car to transport his chef's knives and jackets to and from the St. Helena campus, to off-campus work commitments, and, in the case of his soiled chef's jackets, to the cleaner, did not extend liability to the Culinary Institute. Carrying employer-owned tools of the trade to work does not render an employee's commute within the course and scope of employment, as the Supreme Court has recognized: transporting work materials—even essential ones—to facilitate work does not warrant exception to the going and coming rule "unless such materials require a special route or mode of transportation or increase the risk of injury . . . ." (*Wilson v. Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 181, 185.) "Such cartage is common and must be viewed as incident to the commute rather than as part of the employment." (*Ibid.*; see also *Ducey, supra,* 25 Cal.3d at p. 714 [evidence did not establish applicability of required vehicle exception as a matter of law even though employee sometimes transported cleaning equipment and small furnishings in her car].)

The same is true of Da Fonseca's chef's coats. He testified that he generally left his soiled chef's coats in his car until he had collected a few to take to Klass Cleaners as a matter of convenience. He was not required as a condition of his employment to use Klass Cleaners for cleaning his coats, as he could use alternative methods to launder them, including using a different cleaner or washing them himself. Nor did the trips to Klass Cleaners require the use of his car, as he was free to choose alternative methods of transportation to take his coats there. On top of all this, it was undisputed that Da Fonseca was not traveling to Klass Cleaners at the time of the accident.[10]

## DISPOSITION

The judgment and the order denying the Culinary Institute's motion for judgment notwithstanding the verdict are reversed. The trial court is directed to enter an order granting the motion. The Culinary Institute shall recover its costs on appeal.

---

[10] Because we reverse the trial court's order denying the Culinary Institute's motion for judgment notwithstanding the verdict, we need not address the evidentiary issue the Culinary Institute raises concerning an admission made by Da Fonseca that he worked a variable schedule to accommodate his employer's needs.

28

_____
Richman, Acting P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.


A143545; *Jorge v. Culinary Institute*

29

Trial Court:   Sonoma County Superior Court

Trial Judge:   Hon. Elliot Lee Daum

Counsel:

Gordon & Rees, Charles S. Custer, Ryan T. Birmingham;
Hayes, Scott, Bonino, Ellingson & McLay, Mark G. Bonino, Gabrielle A. Hollingsworth,
for Defendant and Appellant.

Law Office of Edie Sussman, Edie Sussman;
The Veen Firm, Craig M. Peters, Katherine A. Higgins, David L. Winnett;
Wester Law Firm, Barry Wester for Plaintiff and Respondent.