Filed 1/26/22  D-Rock Technology v. Sweeney CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| D-ROCK TECHNOLOGY, INC., <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> CHARLES P. SWEENEY, AXXIS FINANCIAL, LLC, <br><br>     Defendants and Appellants. | A160495 <br><br> (Alameda County Super. Ct. No. RG14750838) |

Plaintiff D-Rock Technology, Inc. (D-Rock) sued defendants Axxis Financial, LLC and its managing director Charles P. Sweeney for breach of contract, conversion, breach of fiduciary duty, concealment and unjust enrichment based on D-Rock's mistaken $100,000 direct deposit overpayment to Sweeney.  Sweeney cross-complained, alleging breach of contract and promissory fraud.[1]

A jury found in D-Rock's favor for the full amount of the mistaken overpayment but awarded a credit for Sweeney's unreimbursed expenses.  It found against Sweeney on the cross-complaint.  Sweeney filed motions for a new trial and judgment notwithstanding the verdict, which the trial court denied.

---

[1]  Generally, we shall refer to Axxis and Sweeney collectively as "Sweeney," unless the context indicates otherwise.

Sweeney raises three primary issues on appeal.  He maintains the court prevented him from presenting a defense by denying a motion to compel production of documents and granting motions in limine by D-Rock.  He further maintains the court erred in denying his motion to file a fourth amended cross-complaint and, at trial, to add a common count for services rendered.  Lastly, he maintains the court erred in denying his motion for a new trial based on "newly discovered" evidence of certain D-Rock bank statements and denying his request for judgment notwithstanding the verdict.

We conclude none of these claims have merit and affirm the judgment.

## BACKGROUND

We set forth the facts to the limited extent necessary to address the issues raised on appeal.[2]

In early 2013, George Gonzalez, the CEO, CFO, and CTO of D-Rock, entered into a written contractor agreement with Sweeney, the managing director of Sweeney's company, Axxis.  Sweeney was to serve as D-Rock's

---

[2]  Sweeney has included in his opening brief five pages of "facts" that are unsupported by any citation to the record, in violation of California Rules of Court, rule 8.204(a)(1)(C).  Seeking to avoid the stricture of this rule of court, Sweeney asserts this section of his brief sets forth "events of this case . . . which were excluded from the trial," so he intentionally provided no citations "to avoid any possible implication that Sweeney was presenting facts from the trial record."  This explanation gets him nowhere.  "When practicing appellate law, there are at least three immutable rules:  first, take great care to prepare a complete record; second, if it is not in the record, it did not happen; and third, when in doubt, refer back to rules one and two."  (*Protect Our Water v. County of Merced* (2003) 110 Cal.App.4th 362, 364.)  Moreover, it is not our task to go hunting through the record to ferret out where in the record evidence of these supposed facts, or at the very least a proper offer of proof,  appears.  Accordingly, we disregard this five-page "fact" section.  (See *Herriott v. Herriott* (2019) 33 Cal.App.5th 212, 222, fn. 15.)

2

"Interim Chief Financial Officer and Head of Business Development," with his primary responsibility to "mak[e] the necessary introduction and briefings to funding sources to close on the capital required to execute on the contractual requirements for the anchor customer, Indovision, which is estimated to be $15M in equity financing." D-Rock agreed to pay Sweeney $20,000 per month via direct deposit to his Axxis bank account and "[r]easonable travel expenses." The parties agreed to "negotiate in good faith a permanent position."

Sweeney introduced D-Rock to Indovision, "the pioneer pay TV provider in Indonesia," and D-Rock and Indovision entered into a partnership agreement. Under the agreement, D-Rock was to "provide to Indovision an exclusive right to market, use and resell the *XStream HD* VOD Service to consumers. . . ." D-Rock agreed, among other things, to "[r]edesign the Media Server to reduce functionality and cost in support [of] the Hospitality VOD services using D-Rock's existing ASIC."

Ultimately, D-Rock "had no funding . . . to start the Indovision project" and "had to just let the project go and move on." D-Rock never sold anything to Indovision, and D-Rock "never made any money from Indovision."

By December 2013, Gonzalez was dissatisfied with Sweeney's performance in finding investors and terminated the contractor agreement. A few days later, Sweeney told D-Rock he had found a new investor. D-Rock and Sweeney "re-negotiated with a limited scope" for Sweeney to work about 20 hours per week, this time at a rate of $10,000 per month, plus D-Rock would now provide health insurance. Gonzalez changed the automatic transfer from $20,000 per month to $10,000 per month.

Because D-Rock's insurance carrier would not provide Sweeney with health insurance unless he was a D-Rock employee, D-Rock placed Sweeney

3

on the company payroll and began to pay him the $10,000 via their " 'bi-monthly payroll.' " D-Rock, however, mistakenly continued to transfer $10,000 per month to Axxis via automatic transfer.

In June 2014, D-Rock terminated Sweeney's employment, effective June 30th, and made his final payroll payment. However, the automatic transfer of $10,000 per month inadvertently continued to be made to Axxis's account until Gonzalez realized, after a call from D-Rock's accountant in late September or early October, that the automatic transfer was mistakenly still being made. Gonzalez explained he did not balance the company checkbook, nor had he noticed the monthly $10,000 automatic payments going to Axxis in 2014.

Gonzalez "turned the automatic transfer off" on November 10th, after the November 7th payment had been made. D-Rock then demanded repayment from Sweeney.

When Sweeney did not make repayment, D-Rock brought this action for breach of contract, conversion, breach of fiduciary duty, concealment, and unjust enrichment. Sweeney cross-complained, alleging causes of action for breach of contract and promissory fraud based on D-Rock's termination of his employment in June 2014 and alleged failure to negotiate with him in good faith.

About three months before trial, the trial court denied Sweeney's motion to amend the fourth amended cross-complaint to add a cause of action for fraud. At trial, the court also denied Sweeney's request to add a common count for "Goods and Services Rendered."

4

The jury found for D-Rock on its mistaken receipt and conversion causes of action and awarded D-Rock $93,513[3] in damages, plus pre-judgment interest from the date the claim for repayment was made. As to the cross-complaint, the jury found for D-Rock on Sweeney's claims for breach of contract and promissory fraud. The court denied Sweeney's motion for new trial and request for judgment notwithstanding the verdict.

## DISCUSSION

### *Denial of Motion to Compel Production of Documents*

Sweeney maintains the court abused its discretion in denying his motion to compel production of six years of D-Rock's and its affiliates' bank statements. He asserts the court "totally rejected the Request At-Issue outright and with prejudice."

Axxis[4] propounded discovery requests that included production of all of D-Rock's bank statements from March 2010 through February 2016. That time period included two years before D-Rock was formed. The specific request at issue was for " 'Monthly statements for EACH bank account owned or controlled by YOU or YOUR AFFILIATES.' "

After D-Rock objected, Axxis filed a motion to compel production of documents and further interrogatory responses, which the trial court denied. In its order, the court stated it "agrees with D-Rock that each of the Requests for Production that are the subject of this Motion are overbroad, too general, and not reasonably particularized, as required by, e.g., *Calcor Space Facility Inc. v. Superior Court* (1997) 53 Cal.App.4th 216, 221–223. Those

---

[3] The difference between the amount awarded and the $100,000 overpayment was due to certain of Sweeney's unreimbursed expenses, which D-Rock conceded.

[4] The discovery requests were propounded by Axxis only.

5

deficiencies, in turn, make responding to these Requests, as phrased, unduly burdensome. . . . [¶] *This order does not preclude Axxis from propounding more narrowly drafted Requests for Production that identify, with reasonable particularity, the specific categories of documents that Axxis actually seeks* to prove its claims or defend against D-Rock's claims." (Italics added.) The order further imposed sanctions on Axxis and its counsel in the amount of $4,895.

Based on the overbroad time frame, alone, the court's order denying Axxis's motion to compel but allowing it to propound "more narrowly drafted Requests for Production" was not an abuse of discretion.[5]

Axxis, however, chose not to propound any more "narrowly drafted Requests for Production." Instead, it subpoenaed the bank records directly from Wells Fargo Bank. It did not receive the records until after trial. It now claims it "could not in good faith file a second motion to compel a second request for monthly bank statements because it would violate the law of the case in contempt of the trial court . . . [and] would also inevitably be vulnerable to discovery sanctions as well as contempt sanctions."

Appellants misconstrue both the trial court's order and the doctrine of "law of the case." " 'The doctrine of "law of the case" deals with the effect of the first appellate decision on the subsequent retrial or appeal: The decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same

---

[5] Appellants claim the order "only allowed new requests that were 'more narrowly drafted' in a particular way urged by *Calcor Space Facility v. Superior Court* (1997) 53 Cal.App.4th 216. The plain language of the order includes no such limitation.

6

case.'  (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 895, p. 928.)" (*Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 491, italics omitted.)

Even if the doctrine applied in these circumstances, which it does not, the trial court's order was not, as appellants assert, "with prejudice."  The order specifically indicated it did "not preclude Axxis from propounding more narrowly drafted Requests for Production that identify, with reasonable particularity, the specific categories of documents that Axxis actually seeks to prove its claims or defend against D-Rock's claims."

In short, Axxis was not foreclosed from propounding new, more narrowly tailored, requests for production of documents, and appellants fail to demonstrate how this discovery order was an abuse of discretion.

## Motions in Limine

Sweeney also claims the trial court's rulings on D-Rock's motions in limine were unfair and denied him due process, and therefore are reversible per se.  However, a "court's ruling on a motion in limine is reviewed for abuse of discretion," (*Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1493) which is appellant's burden to establish.  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 331.) "The routine and proper application of state evidentiary law does not impinge on a defendant's due process rights."  (*People v. Riccardi* (2012) 54 Cal.4th 758, 809, overruled on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

Sweeney's briefing on this issue, spanning almost 50 pages of his opening brief, is far from a model of clarity and we address the rulings to which he appears to object by category.[6]

---

[6]  As noted by D-Rock, "it is difficult to summarize briefly and concisely the myriad claims in Sweeney's 'unfairness' sections. . . ."

*Evidence supporting damages claims made in cross-complaint*: Sweeney describes the court's in limine rulings as excluding "any evidence that suggested to the jury damages greater than what the trial court felt were available to Sweeney based on its review of the pretrial record and . . . *Copeland*,"[7] specifically excluding evidence about Sweeney's claimed "lost opportunities." Although not identified by Sweeney in his briefing, these appear to be rulings on motions in limine numbers 1, 3, 7, and 8, which concerned Sweeney's claimed damages.[8]

However, the issue of damages in connection with the cross-complaint is a moot point since the jury found against Sweeney and in favor of D-Rock on the cross-complaint. Thus, even if the trial court erred in excluding evidence of Sweeney's claimed damages, an issue we need not and do not reach, any error was harmless because the jury never reached the issue of

---

[7] In *Copeland v. Baskin Robbins U.S.A.* (2002) 96 Cal.App.4th 1251, the court held: "the appropriate remedy for breach of a contract to negotiate is not damages for the injured party's lost expectations under the prospective contract but damages caused by the injured party's reliance on the agreement to negotiate." (*Id*. at pp. 1260–1261, fn. omitted.) "[D]amages for breach of a contract to negotiate an agreement are measured by the injury the plaintiff suffered in relying on the defendant to negotiate in good faith. This measure encompasses the plaintiff's out-of-pocket costs in conducting the negotiations and may or may not include lost opportunity costs. The plaintiff cannot recover for lost expectations (profits) because there is no way of knowing what the ultimate terms of the agreement would have been or even if there would have been an ultimate agreement." (*Id*. at pp. 1262–1263, fns. omitted.)

[8] At the hearing on the motions in limine, Sweeney did not contest the rulings on numbers 2, 4, 5, and after clarification, the ruling on motion in limine number 6, thereby forfeiting any challenge to these rulings on appeal. As to motion in limine number 8, the court ruled if Sweeney decided to introduce the evidence identified in the motion, he "must approach the Court and give me an offer of proof."

damages.  (See *Piedra v. Dugan, supra,* 123 Cal.App.4th at p. 1493 [any error in refusing jury instruction on damages was harmless because jury found for defendant, and never reached the issue of damages].)

*Evidence of liability on cross-complaint.*  Sweeney next complains that the in limine rulings "exclude[d] several categories of Sweeney's most favorable evidence of D-Rock's liability and his lack of liability."  He identifies these as "(a) the defined and concrete value that the [Indovision Partnership Agreement] created for D-Rock on the day it was executed, (b) the availability of non-D-Rock technology with which the joint venture partners or Indovision could have carried out the goals of the IPA; and (c) the availability of Sweeney 's other opportunities."  Relying on *Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659 (*Kelly*), Sweeney asserts "[i]t was impossible to explain [the] events and the motivations of the parties" absent this evidence.

In *Kelly*, the plaintiffs brought a personal injury action after being injured on an elevator that stopped between floors, known as " 'mis-level[ing].' "  (*Kelly, supra,* 49 Cal.App.4th at p. 664.)  The building had two elevators next to each other, one small and one large.  One plaintiff testified at her deposition that she was on the smaller one, while the other plaintiff testified at her deposition that she could not recall which elevator was involved.  (*Id.* at pp. 664–665.)

During discovery, plaintiffs learned an employee of the defendant elevator maintenance company had worked on the large elevator the day of the accident because it was mis-leveling and returned a week later to do "major repairs" on that elevator.  (*Kelly, supra,* 49 Cal.App.4th at p. 665.)  After " 'further thought and a review of the photographs,' " the plaintiff who

9

had testified she was on the small elevator stated in a declaration that she was " 'now . . . not sure if it was the large or small elevator.' " (*Id*. at p. 666.)

The court granted the elevator maintenance company's motions in limine to exclude any evidence that plaintiffs were in the large elevator, any evidence related to the functioning of the large elevator, and the testimony of plaintiffs' expert, who at deposition had testified primarily about the large elevator problems. (*Kelly*, *supra*, 49 Cal.App.4th at pp. 667–668.) The Court of Appeal reversed, stating "It is a misuse of a motion in limine to attempt to compel a witness or a party to conform his or her trial testimony to a preconceived factual scenario based on testimony given during pretrial discovery." (*Id*. at p. 672, italics omitted.) A "court abuses its discretion when it precludes a party from trying a case on a theory consistent with existing evidence, even though the pretrial testimony of the party relating to how the accident occurred is contrary to the theory." (*Id*. at pp. 672–673.)

Sweeney maintains "[t]he parallels between *Kelly* and this case are therefore unmistakable." He asserts in *Kelly*, the elevator company " 'sought to compel plaintiffs to try the case solely on the basis that the accident occurred on the smaller elevator, urging that any evidence relating to the large elevator was irrelevant.' [Citation.] Here, D-Rock [assertedly] sought to compel Sweeney to try the case solely on the basis that the [Indovision Partnership Agreement] value to D-Rock was purely speculative and undefined, that no non-D-Rock technology existed to carry out the IPA, and that Sweeney had no other opportunities from which his non-compete precluded him."

The circumstances in *Kelly* and this case are not comparable. The court excluded no evidence that Sweeney learned, after his deposition, that his claimed economic injuries were caused by a different mechanism. Indeed,

10

Sweeney claims the excluded evidence was admissible to "to explain [the] events and the motivations of the parties."

Further, and contrary to Sweeney's claim, the trial court excluded certain evidence as to damages but allowed its admission for background purposes. The court, for example, indicated "you can use the marketing materials to say this is what the prospective or the potential value of the deal might have been if that box had ever been manufactured. And that's frankly simply going to come in as fluff around the edges to give the background to the jury. And if anybody crosses a line and makes it seem as though that's a calculation of the damages I will declare a mistrial."

*Comments by court.* Lastly, Sweeney claims certain comments by the trial court during the hearing on the motions in limine were factually inaccurate "rulings." He sets forth what he asserts are the "actual facts," citing to evidence either in the trial record or, in one instance, to certain Web sites.[9]

The court's comments about the evidence at the hearing were not "rulings," nor did those comments prevent the evidence Sweeney cites from being introduced at trial. To the extent he provides record citations to the "actual facts" (and not improper extra-record references), he effectively concedes the motions in limine did not exclude evidence of those facts.

In sum, Sweeney has failed to show any error in the trial court's in limine rulings. And even if the court erred in excluding certain evidence

---

[9] Sweeney claims the court's comment during the motion in limine hearing that " 'in Indonesia . . . $300 is a lot . . . for a streaming box' " was a factually inaccurate "ruling." Sweeney fails to explain how this comment was a "ruling," or identify any evidence to the contrary that was excluded. Instead, on appeal, he cites, improperly, to sources outside the record about wealth in Indonesia.

regarding his claimed damages, there was no prejudice given that the jury found for D-Rock on the cross-complaint and never reached the issue of damages.

### *Denial of Motion to Amend Cross-Complaint*

Sweeney maintains the trial court further erred in denying his motion to amend the cross-complaint to add a cause of action for fraud (in addition to his cause of action for promissory fraud) and in denying his request to add a common count for "services rendered."

We review the denial of a motion for leave to file an amended complaint for abuse of discretion. (*Baranchik v. Fizulich* (2017) 10 Cal.App.5th 1210, 1217.) "We never presume error; an appellant must affirmatively show error by an adequate record." (*Ibid.*)

About three months before trial began, Sweeney filed a motion to amend his fourth amended cross-complaint to add a cause of action for fraud. Sweeney's counsel declared that he "was unaware of this claim until we received documents from third parties and completed recent depositions of the parties. This new information revealed new dimensions to the fraud of which the Cross-complainant had been unaware."

The trial court denied the motion, stating its reasons in a lengthy, single-spaced order. The motion indicated it would " 'add a cause of action for Fraud which is distinct from Promissory Fraud and is based on newly discovered evidence.' . . . Although neither the notice of motion nor supporting declaration discloses or explains this, the memorandum states in a conclusory manner that the amendments also include '[r]efinement and clarification of the Breach of Contract and Promissory Fraud allegations.' " The court indicated the "motion does not sufficiently comply with Cal. Rules of Court (CRC) 3.1324 and does not demonstrate cause for permission to

12

amend the cross-complaint, which has already been amended three times and been the subject of three prior rounds of pleading challenges. Among other things . . . Cross-Complainants have been dilatory in seeking to add approximately 15 pages of new allegations and a new legal theory four and one-half years after the answer was filed." The court noted counsel's declaration in support of the motion "does not provide a satisfactory reason why Cross-Complainants did not seek to amend at any earlier time or what specific 'facts' they allegedly discovered that they could not have discovered more promptly. . . ." Lastly, the trial court stated "Cross-Complainants' insufficiently explained delay in seeking amendment would result in prejudice to Cross-Defendants if the amendments were permitted at this late date."

Sweeney maintains the court erred because the proposed amendment "simply added a new wrinkle to Sweeney's long-standing allegation that he had been duped into securing the [Indovision Partnership Agreement] for D-Rock." He also claims the court was wrong in finding he was dilatory in seeking the amendment because the court "was not involved in discovery and appeared unaware that Sweeney was effectively forced to conduct his own investigation. . . ." As to prejudice to D-Rock, Sweeney claims "any concerns regarding prejudice could have been addressed through a continuance."

Sweeney's arguments are, themselves, contradictory. On the one hand, he claims he needed to amend the cross-complaint to add an entirely new cause of action, and on the other hand, that the proposed amendment was only a "new wrinkle" that "simply completed the story." This does not begin to demonstrate an abuse of discretion by the trial court. It is also wholly unclear why being "effectively forced to conduct his own investigation," which is the essence of discovery, demonstrates he was not dilatory.

13

His assertion that any concerns about prejudice to D-Rock could have been alleviated by a continuance, likewise, does not establish any abuse of discretion on the part to the trial court. Prejudice is "clearly shown . . . [where the defendant] had not discovered or deposed many of the witnesses who would support the new allegations, and had not marshaled evidence to oppose the [new] contention." (*Magpali v. Farmers Group, Inc.* (1996) 48 Cal.App.4th 471, 486–487.) "Where the trial date is set, the jury is about to be impaneled, counsel, the parties, the trial court, and the witnesses have blocked the time, and the only way to avoid prejudice to the opposing party is to continue the trial date to allow further discovery, refusal of leave to amend cannot be an abuse of discretion." (*Id.* at p. 488.)

As for Sweeney's assertion that the court abused its discretion in denying his request at the outset of trial to add a common count to the cross-complaint, the court told Sweeney's attorney: "I have not received anything with regard to a cross-complainant's request to amend the cross-complaint." Counsel responded "We did propose jury instructions. There was an opposition filed. We think that as the evidence comes in we would be entitled to a common count of quantum meruit. . . . [¶] [The Court]: Then you should have amended it earlier, sir. And no, we will not be entertaining new theories as we have the jury sitting in the jury room waiting for opening statement. [¶] [Counsel]: That's fine. And we were not going to amend at this point anyway."

Later, midway through trial, Sweeney filed a motion to add a common count for "Goods and Services Rendered" as set forth in CACI No. 371. The court also denied this motion, stating Sweeney's counsel "requested [CACI No.] 371 on service[s] had and received. As I think I mentioned briefly yesterday, we went through three demurrers and a motion for summary

14

judgment refining the causes of action that [Sweeney's counsel] was presenting in this trial. [CACI No.] 371 was not one of them and so it will be excluded."

Sweeney maintains the court treated him unfairly, because it had allowed D-Rock's common count for mistaken payment. To begin with, Sweeney's requests to amend made at the outset of, and mid-way through, trial were made so late that the prejudice flowing from a continuance was self-evident. Further, Sweeney had already disclaimed any intent to amend the cross-complaint to add a common count.

In short, Sweeney has not shown any abuse of discretion by the trial court in denying his twelfth-hour requests to amend, yet again, his fourth amended cross-complaint.

### Denial of Motion for New Trial

Sweeney also claims the trial court erred in denying his motion for a new trial based on newly discovered evidence, namely the monthly bank statements he received about a week after trial concluded in response to the subpoena of Wells Fargo records.

"A party may base a motion for new trial on '[n]ewly discovered evidence, material for the party making the application, which he could not, with reasonable diligence, have discovered and produced at the trial.' (Code Civ. Proc., § 657, subd. 4.) However, new trials for newly discovered evidence are disfavored. [Citation.] A party moving for new trial on the basis of newly discovered evidence must show: (1) the evidence is newly discovered, (2) it could not with reasonable diligence have been discovered and produced earlier, and (3) the evidence is material. [Citation.] Evidence is material if it is likely to have produced a different result. (*Santillan v. Roman Catholic Bishop of Fresno* (2012) 202 Cal.App.4th 708, 728. . . .) Whether a reasonable

15

effort was made to discover the evidence, and whether it was material are questions addressed to the sole discretion of the trial court, and will not be disturbed absent a manifest showing of abuse of discretion." (*Missionary Guadalupanas of Holy Spirit Inc. v. Rouillard* (2019) 38 Cal.App.5th 421, 438.)

To begin with, Sweeney failed to demonstrate reasonable diligence in discovering and obtaining the Wells Fargo bank statements. He admits the trial court, in its order denying the motion to compel production, specifically stated Axxis could "propound[] more narrowly drafted Requests for Production that identify, with reasonable particularity, the specific categories of documents that Axxis actually seeks to prove its claims or defend against D-Rock's claims." As we have discussed, Axxis failed to do so and Sweeney now seeks to excuse that failure on the ground any attempt to propound more narrowly drafted requests would have run afoul of the "law of the case" doctrine. However, as we have explained, Sweeney is incorrect. No legal doctrine barred a more tailored discovery request.

Sweeney also failed to demonstrate that these records were material. He claims the statements proved "Gonzalez had actual and constructive knowledge of the $10,000 direct deposits . . . [which] would have shown there was no mistake." The critical issue, however, was not whether Gonzalez had actual or constructive knowledge of the $10,000 direct deposits made to Sweeney from January to November 2014. The issue was whether those 10 direct deposit payments were duplicates and made to Sweeney in error. " ' "[M]oney paid under a mistake of fact may be recovered back, *however negligent the party paying may have been in making the mistake. . . .*" ' " (*Doyle v. Matheron* (1957) 148 Cal.App.2d 521, 522–523 (*Doyle*).)

16

Gonzalez testified that as soon as the fact the payments had been made in error was brought to his attention after questions by D-Rock's accountant, he demanded repayment. Even if Gonzalez had actual knowledge those direct deposit payments were being made, that knowledge does not demonstrate he realized the payments were made in error and based on a mistake of fact.

Accordingly, the court did not err in denying Sweeney's motion for new trial.

### Denial of Motion for Judgment Notwithstanding the Verdict

Finally, Sweeney maintains the trial court erred in denying his motion for judgment notwithstanding the verdict (JNOV).

" ' "A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support." ' [Citation.] If there is any substantial evidence, contradicted or uncontradicted, to support the verdict, we affirm the verdict." (*Burch v. CertainTeed Corp.* (2019) 34 Cal.App.5th 341, 348 (*Burch*).)

At the outset, we note the trial court denied what it termed Sweeney's "request" for JNOV due to failure to file a motion in compliance with Code of Civil Procedure section 629, subdivision (b). In its order denying the motion for new trial, the trial court noted that a motion for judgment notwithstanding the verdict "does not appear separately on the Court's law and motion calendar and Defendants' do not appear to have paid a filing fee related to such a motion. Thus, even though the parties have separately briefed a motion for judgment notwithstanding the verdict, the Court does not consider such a motion to be properly before the Court. To the extent the

17

Court is required to rule on the motion for judgment notwithstanding the verdict, either procedurally or substantively, the motion is DENIED."

The court cited to Code of Civil Procedure section 629, subdivision (b), which provides in part: "A motion for judgment notwithstanding the verdict shall be made within the period specified by Section 659 for the filing and service of a notice of intention to move for a new trial. The moving, opposing, and reply briefs and any accompanying documents shall be filed and served within the periods specified by Section 659a, and the hearing on the motion shall be set in the same manner as the hearing on a motion for new trial under Section 660."

Sweeney does not dispute that he did not properly file a motion for judgment notwithstanding the verdict and did not pay a filing fee for such a motion. Instead, he asserts—incorrectly—that the "trial court rejected the motion without explanation." As we have recited, the court did, indeed, provide an explanation—that Sweeney failed to file a motion in compliance with statutory requirements.

Sweeney also does not dispute that substantial evidence supported the verdict. After D-Rock noted in its respondent's brief that an appellate court reviews the denial of a JNOV motion for substantial evidence, Sweeney stated in his reply brief that he "is not appealing on the conventional basis of questioning the sufficiency of D-Rock's evidence." Instead, he states "we are requesting that this court reweigh the evidence *de novo*" using the "proper legal standard." The apparent support for this request is an excerpt from *Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.* (2006) 144 Cal.App.4th 1175, which states: "An appellate court reviews the grant or denial of a motion for JNOV de novo using the same standard as the trial court. [Citation.] A JNOV must be granted where, viewing the evidence in

18

the light most favorable to the party securing the verdict, the evidence compels a verdict for the moving party as a matter of law." (*Id*. at p. 1194.)

Sweeney has confused this court's standard of review of a trial court's ruling, and the substantive standard that applies when ruling on a JNOV motion. Our review of a JNOV ruling is the same as that of the trial court, and thus de novo. We therefore determine whether "any substantial evidence, contradicted or uncontradicted" supports the verdict (*Burch, supra,* 34 Cal.App.5th at p. 348[10]), and Sweeny does not dispute that there is such evidence. Accordingly, JNOV was properly denied.

Sweeney nevertheless maintains JNOV should have been granted because "undisputed evidence showed that D-Rock received benefits for the payments and that Sweeney detrimentally relied on them."

" ' "It is now settled . . . that money paid under a mistake of fact may be recovered back, however negligent the party paying may have been in making the mistake, unless the payment has caused such a change in the position of the other party that it would be unjust to require him to refund." ' " (*Doyle, supra,* 148 Cal.App.2d at pp. 522–523.) The defense of detrimental reliance on a mistake, however, requires that the reliance be reasonable and that ordering a refund be unjust. (*Id.* at p. 523; *Ghirardo v. Antonioli* (1996) 14 Cal.4th 39, 54.)

_____

[10] " 'On appeal from the denial of a motion for judgment notwithstanding the verdict, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict. [Citations.] If there is, we must affirm the denial of the motion. [Citations.]' [Citations.] For evidence to be substantial, it must be of ponderable legal significance, reasonable, credible, and of solid value. [Citation.] The 'focus is on the quality, not the quantity, of the evidence.' [Citation.] We resolve all evidentiary conflicts and indulge all reasonable inferences in support of the judgment." (*Jorge v. Culinary Institute of America* (2016) 3 Cal.App.5th 382, 396.)

19

Sweeney claims that, even if the extra $10,000 monthly direct deposit payments were a mistake, he detrimentally relied on these payments and changed his position based on them by "provid[ing] additional services and dropp[ing] clients in reliance on D-Rock's payments and requests for services."  (Boldface omitted.)

To begin with, Sweeney did not plead reliance on receipt of the mistakenly made $10,000 payments as an affirmative defense in his answer to the complaint.  Instead, he alleged he was entitled to the extra payments because his $20,000 per month agreement did not change after his first termination in December 2013 (which the jury found was not true), and that the extra payments after his second termination in June 2014 were severance payments (which the jury also found was not true).  Nor did he request that the jury be instructed on his claimed reliance defense as to the additional, mistakenly made payments.  (In contrast, he did request such an instruction as to his claimed reliance on D-Rock's false promises.)  Accordingly, Sweeney doubly forfeited this issue—first, by failing to plead this affirmative defense in his answer and secondly by failing to ask that the defense be submitted to the jury.  (See *Department of Finance v. City of Merced* (2019) 33 Cal.App.5th 286, 294 [" 'Affirmative defenses must not be pled as "terse legal conclusions," but "rather . . . as facts 'averred as carefully and with as much detail as the facts which constitute the cause of action and are alleged in the complaint.' " [Citation.]  "A party who fails to plead affirmative defenses waives them." ' "]; *People v. Lucas* (2014) 60 Cal.4th 153, 299 [failure to request instructions forfeits claim], overruled on other grounds in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.)

Further, Sweeney points to no evidence that he relied on his receipt of the extra, mistakenly made direct deposits, as opposed to the agreed-upon

20

monthly payment he received via the payroll payments, in providing services to D-Rock or dropping other clients. Nor does he point to any evidence that the claimed reliance on the extra, erroneously made payments was reasonable.

In sum, even had Sweeney filed a proper motion for JNOV in compliance with Code of Civil Procedure section 629, which he failed to do, he forfeited his belatedly raised reliance defense by failing to plead it and by failing to ask for instructions on it. And, in any case, this court does not conduct a de novo review of *the evidence* but rather, reviews for substantial evidence, an issue Sweeney does not address or dispute.

## DISPOSITION

The judgment is affirmed. Costs on appeal to respondent.

21

_____

Banke, J.


We concur:


_____

Humes, P.J.


_____

East, J.


A160495, D-Rock Tech. Inc. v. Sweeney et al