Filed 3/26/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

<table>
<tr><td>JESSICA DURAN SOBALVARRO,<br><br>  Plaintiff and Appellant,<br><br>v.<br><br>VIBRA HEALTH CARE et al.,<br><br>  Defendants and Respondents.</td><td>A168792<br><br>(Marin County<br>Super. Ct. No. CIV1700712)</td></tr>
</table>

In 2015, plaintiff Jessica Sobalvarro suffered a serious stroke that left her unable to move or speak. She thereafter spent some six months at Kentfield Hospital (Kentfield), where she was cared for by Kene Orleans, a certified nursing assistant. Plaintiff was discharged from Kentfield in 2016, following which she brought suit against Kentfield, its corporate parent Vibra Health Care (Vibra), and Orleans, alleging that she was sexually assaulted by Orleans while at Kentfield, asserting claims for assault, battery, negligence, and abuse of a dependent adult. Plaintiff's case proceeded to a jury trial, where the jury, after lengthy deliberations, concluded that plaintiff had not proved her claims against Orleans but had proved her negligence claim against Kentfield and Vibra, and awarded her $1,000,000 in non-economic damages. Kentfield and Vibra moved for judgment notwithstanding the verdict, which the trial court granted, concluding that the causal nexus between defendants' negligence and plaintiff's injury was lacking. Plaintiff appeals, with the fundamental argument that the

1

judgment notwithstanding the verdict to defendants was error.  We agree, and we reverse.

## BACKGROUND

**The Parties and Paul Kranz, a Participant**

In 2007, plaintiff was living in Nicaragua, where she met Paul Kranz, an attorney practicing civil litigation in the Bay Area, meeting through the nonprofit of which he was the executive director.  Kranz's partner's nephew is also the "half-brother of [plaintiff's] three sons."  In 2012, plaintiff moved to California and began working as a dental assistant in San Francisco.  Kranz found her and her sons an apartment "just down about a block" from his home in Albany "so that they would be close."

Kentfield is an acute care short-term rehabilitation hospital in Kentfield, Vibra its corporate parent.  And from 2003 at least until the time of trial in 2023, Orleans was a certified nursing assistant employed at Kentfield.

**Plaintiff's 2015 Stroke**

On September 15, 2015, plaintiff, then 34 years old, suffered a "very serious" hemorrhagic stroke at home.  Around 9:15 a.m. that morning, one of her sons rang Kranz's doorbell and told him that he had tried unsuccessfully "to wake his mom up."  Kranz went to plaintiff's apartment and, not "able to rouse her at all, called 911.  Plaintiff was taken to Alta Bates Hospital in Berkeley, and on October 19, transferred to defendant Kentfield.  Other than an approximately 10 day period plaintiff spent at UCSF (where she went after slipping into a coma), she remained at Kentfield until May of 2016, some six months.

Plaintiff's stroke had affected her thalamus, a "relay station in your brain" involved in sensory perception and motor control, and her mid brain.

2

At the time of her admission to Kentfield, she was "lethargic," had had a tracheotomy, and was on a ventilator. And she was unable to communicate verbally.

While plaintiff was at Kentfield, Kranz was her medical decision maker. When plaintiff was first admitted, Kranz participated in an "intake interview" during which Kentfield employees "explained more or less the procedures there, the policies, visiting hours, [and] what services they were going to provide." Kranz would later testify that he was present and "involved in [the] conversations with people at Kentfield" when plaintiff was first admitted, and that no one asked him whether she "preferred to be cared for by male or female attendants," either during the check-in process or at any other time.

Initially, plaintiff communicated with Kranz by blinking her eyes: he would "ask her a question, and I'd ask her to blink once if it was a yes, twice if it was no, or to blink if she understood the question, just to blink." Plaintiff's ability to communicate improved "considerably" over time, and by mid- to late-November, she began nodding or blinking to indicate letters on a letter board, and by December she and Kranz had memorized the letter board—and thus able to have conversations beyond yes or no questions.

Dr. Deborah Doherty, one of plaintiff's doctors at Kentfield, would testify that the part of plaintiff's mid brain that was damaged "helps . . . regulate things like urination" and "bow[e]l movements," and that as a result plaintiff was, at least while at Kentfield, incontinent. "[G]iven [plaintiff's] paralysis," keeping her clean in order to prevent infection and skin breakdown was "the responsibility of the staff," and this involved

cleaning the " 'peri' area. Basically the area in your underpants around your front and back . . . ."[1]

While at Kentfield, plaintiff was cared for by defendant Orleans, a certified nursing assistant, whose responsibilities included taking vital signs, "turning patients," emptying catheters, providing "pericare," and giving bed baths.

Plaintiff remained at Kentfield until she was discharged to Windsor, a skilled nursing facility in Pleasant Hill, on May 4, 2016.

On May 11, Kranz had a conversation with plaintiff that prompted him to call his sister, a clinical psychologist whose "practice includes treating women who have been victims of sexual abuse," and "somebody I know professionally in Los Angeles who provides training or has provided training . . . to the Los Angeles Police Department on how to investigate allegations, cases of sexual assault and rape." This action followed.

**The Proceedings Below**

On February 24, 2017, represented by Kranz, plaintiff filed suit against Vibra, Kentfield, and Orleans, alleging four causes of action: (1) dependent adult abuse/neglect, (2) negligence, (3) battery, and (4) assault. The first cause of action alleged that "[c]ommencing on or about December 2015, and continuing for months thereafter, [plaintiff] was sexually assaulted while in her room at [Kentfield] by [Orleans]." Then, as relevant to the issue here, the negligence cause of action, the complaint alleged that Kentfield and Vibra "failed to exercise the degree of skill and care commonly required of General

---

[1] According to Dr. Doherty, even "good cleaning is . . . [¶] . . . not a guarantee you won't get infected. Infections are pretty common within people with this sort of neurologic disability with incontinence. And we rely on the nursing staff to keep them as clean as possible."

4

Acute Care Hospitals pursuant to Title 22 of the California Code of Regulations," that "[a]s a direct legal result of the negligence and carelessness of Defendants, and each of them . . . [plaintiff] was sexually assaulted and was injured," and that "[a]s a further direct legal result of the negligence of Defendants . . . [plaintiff] was injured and suffered fear, anxiety, humiliation, physical pain and discomfort, and emotional distress . . . ."[2]

Trial was initially set for March, 2019, then April 1, 2020. At some point thereafter, the parties stipulated to waive the five-year deadline to bring the case to trial and extended the deadline to May 24, 2023.[3]

Trial began on April 20, and testimony took place over six court days, concluding on April 28.

_____

[2] On December 1, 2022, the firm of Siegel, Yee, Brunner & Mehta filed a notice of appearance as additional counsel for plaintiff.

[3] On March 2, 2023—with trial then set for April 11, and despite the closure of discovery in July of 2022—plaintiff moved to augment her expert witness list with the testimony of Sheri L. Johnson, "an expert on sexual trauma," who plaintiff's counsel expected "to testify that [plaintiff] is and has not been cognitively impaired, is and has been able to perceive and understand what she has experienced and is and has not been delusional as a result of the stroke she suffered," and to "offer expert opinions on the issue of damages." As explanation for the late disclosure, plaintiff's lead counsel argued that he had made his first appearance in the case on December 1, 2022, and that defendants' person most knowledgeable, Denise Mace, had been deposed on January 31, 2023, and had testified that she had been told by healthcare professionals investigating plaintiff's claims that " 'at times . . . [plaintiff], cognitively, . . . did [not] communicate an assault or inappropriate touching of her,' " and that patients such as plaintiff "often mistake routine cleaning activities as sexual misconduct." The trial court held a hearing on the motion on March 17, and denied it by written order on March 20.

### *Plaintiff's Case*

Plaintiff's case included the testimony of her expert, Pamela Sharkey; Paul Kranz; Dr. Doherty; Marin County Detective George Bernheim, who had investigated plaintiff's claims of sexual assault; Daniel Zavala, plaintiff's ex-husband; Denise Mace, Kentfield's chief operating officer responsible for overseeing the nursing staff until her retirement in 2021[4]; two of plaintiff's sons, Joao and Hamlet Zavala; and plaintiff herself.

Sharkey is a registered nurse, teaches "medication classes," and has testified as "an expert witness for the Department of Justice and many attorneys . . . with regards to sub-acute units, long-term care and assisted living cases." As relevant here, Sharkey opined that a hospital has "an obligation to determine a patient's preference in terms of the gender of the person caring for that patient," and to respect the patient's request, as part of the "respect" to which the patient is entitled under the Patient's Bill of Rights (Cal. Code Regs., tit. 22, § 72527 et seq.), in particular "the right . . . [t]o be treated with consideration, respect and full recognition of dignity and individuality, including privacy in treatment and in care of personal needs." (*Id.*, § 72527, subds. (a), (a)(12).) As Sharkey put it: "When you say to a female resident do you mind if a male resident cleans you because you're incontinent or would you rather have a female . . . in my experience, 99 percent of the time . . . a female wants a female to clean her." And asked, "in your opinion, is the hospital supposed to respect that request?," Sharkey answered, "I would expect them to request [*sic*] the dignity of the resident who they are taking care of, yes."

Mace admitted that Kentfield did not tell or "instruct" female patients that they had a right "not to be cared for by male" nurses, but agreed that

---

[4]     Mace was called and examined pursuant to Evidence Code section 776.

they were "required to honor" and "respect" such requests if made; that they did in fact honor such requests; and that Kentfield kept track of them through "a list in the clinical house supervisor's office."[5]

Daniel Zavala, plaintiff's ex-husband and the father of her children, testified that he visited plaintiff four or five days a week during her time at Kentfield, for two to four hours at a time. Beginning in January of 2016, he saw her crying "[m]any, many times."[6] He also saw Orleans "[m]any times"

_____

[5] Mace's testimony included the following:

"Q. Okay. Would you agree that Kentfield at the time you worked there was required to honor requests from female patients that they not be cared for by male CNAs?

"A. Yes. We would keep a list in the clinical house supervisor's office so that when they made assignments, that a male—you know, we would respect the patient's request because that's not the only requests we would get about who took care of them.

"Q. And what was done at Kentfield to make sure that women patients were told that they had the option to refuse to be cared for by male attendants?

"A. We didn't instruct them. We honored—[¶] If they had any concerns or complaints, we would honor their requests.

"Q. But no one would tell them this is a right that you have. Is that correct?

"A. That's correct. Each patient, though, receives on their admission paperwork the rights of the patient and what rights they have.

"Q. So there is a written statement of patients' rights?

"A. It's a written patients' rights that's given to the patient on admission."

[6] The trial court sustained defendants' hearsay objection to the question "[h]ow would [plaintiff] respond when you asked her why she was crying?" Plaintiff's offer of proof at the sidebar conference that followed was that plaintiff had said, " 'I don't want to be cleaned by men,' " an answer plaintiff's counsel indicated plaintiff wished to introduce "[t]o show that her distress was caused by her not wanting to be cleaned by men."

during his visits. On one occasion, he entered plaintiff's room as Orleans was leaving to find "nobody [else] there." One other occasion, he arrived at plaintiff's room to find Orleans "changing [plaintiff], and he close[d] the door. . . . [W]e were waiting in the hall for 10 minutes or 25 minutes. That happened two times."

Joao Zavala testified that he visited his mother with his father and brothers three to five times a week while she was at Kentfield. They would sometimes arrive to find her door closed and were told that "she was getting changed or had to be changed." When asked as to his mother's demeanor, he answered that "[d]uring that time she would look sad. She seemed worried, upset. Mainly she looked very sad." "When we would come in she would be crying, a lot of tears in her eyes."

Joao's brother Hamlet likewise visited plaintiff "[t]hree to four times a week," for "[t]hree to four hours probably." He also saw his mother crying, and when asked how often, answered, "I'm not sure, but I saw her throughout the beginning of 2016, towards the end of 2015." Hamlet also testified that after her time at Kentfield, plaintiff "didn't want to" and was "not changed or cleaned by men."[7]

On April 27, plaintiff testified, using a letter board and the assistance of a family friend. According to her testimony, Orleans "put his penis in [her]

---

[7]    "Q. Are you aware of whether Ms. Sobalvarro has been changed and cleaned by men after she left Kentfield?

"A. She stated that she didn't want to be changed by men.

"Q. So is the answer— [¶] What is the answer to the question?

"A. No, not after Kentfield.

"Q. So she is not changed or cleaned by men after she left Kentfield?

"A. Yeah."

vagina once," in December 2015, and that she could not do anything to stop him, and it felt "terrible." She also testified that Orleans "put his fingers in [her] vagina" five times, in January, February, and March of 2016, "[e]arly" in the morning when there were no other staff members present. What Orleans did hurt her, "[i]n [her] vagina." She did not tell anyone at Kentfield about what happened because she was "[a]fraid" Orleans would "do it again." When asked how she felt "about what happened to you at Kentfield Hospital," plaintiff answered "[v]iolated," and when asked whether she "think[s] about this every day," answered, "Yes." Finally, when asked if Orleans raped her, plaintiff answered, "Yes."

Plaintiff's case ended with the further testimony of Daniel Zavala that beginning in January of 2016 and continuing until March or April, plaintiff told him "[m]any times" "that she had a pain in her vagina."

### *Defendants' Case*

Defendants' case began and ended on April 28, lasting some six hours, and consisted of the testimony two witnesses: Linda Shively, the former head of the speech therapy department at Kentfield, and Orleans.

Orleans's duties at Kentfield included taking vital signs; serving breakfast; "turning patients," which usually had to be done every two hours; emptying catheters; performing "pericare," using a spray tube, a towel, and wipes; and providing each patient a bed bath once a day.

Orleans denied sexually assaulting plaintiff. He acknowledged that in providing pericare and bed baths for female patients, Kentfield's guidelines "require . . . two people to get it done," and "if I'm male, I have to get some female with me. Like one male, one female." He also testified that he "never close[d]" the door to patients' rooms when performing any aspect of his duties, but would only "close the curtain for privacy."

9

Orleans had a "very busy" work schedule, and "generally, it was so busy" that he did not even have time to take scheduled 15 minute breaks, and sometimes did not have time to input his notes into the computer system until the end of the day. He also agreed with his deposition testimony that "sometime, you know, when you there, you working, you have so much pressure to do, you just in and out in the patient room. You finish this one, they call you for another one. You don't have time to staring [*sic*] people, watching people in their eyes. We don't have time for that. We just trying to focus doing our job to get done."

### *Jury Instructions, Closing Arguments, Deliberations, and Special Verdict*

On May 1 and 3, counsel and the court discussed the instructions and the special verdict form. At the beginning of that discussion, the trial court indicated the parties had submitted documents entitled, "Agreed Jury Instructions" and "'Plaintiff's Proposed Jury Instructions," which were "instructions the plaintiff wants which the defense does not agree to."[8] Plaintiff's proposed instructions included CACI No. 400 on the factual elements of negligence; CACI No. 418 on the presumption of negligence per se, with specific refence to the Patients' Bill of Rights and various other statutes; and a proposed special instruction on the factual elements of a violation of Patients' Bill of Rights.

In discussing the defendants' request for jury instructions on medical negligence, the trial court asked plaintiff's counsel for a "description of what your theory of negligence is as to Vibra and Kentfield Hospital." Counsel explained that one such theory was based on Sharkey's testimony that

---

[8] Neither the "Agreed Jury Instructions" nor any written version of the final instructions as read to the jury are in the record.

10

Kentfield had an "obligation to protect patient's rights and that includes the obligation to ensure that a patient who objects to receiving intimate care from a male employee has a right to do so." The trial court observed that there was "conflicting evidence" on this point, but agreed with plaintiff's counsel that such evidence "could potentially" support a negligence claim, and "might support a negligence per se theory."

After the discussion, the trial court indicated it would create a draft set of proposed instructions over the midday recess. After that break, with respect to CACI No. 400, the parties agreed to the trial court's phrasing of the instruction, stating that "plaintiff claims that she was harmed by Vibra, Kentfield, and Orleans." With respect to CACI No. 418, the trial court indicated it had phrased the instruction such that 22 California Code of Regulations, section 72527 would be provided, but not read, to the jury, a phrasing to which both counsel agreed.

On May 2, defendants filed a motion for nonsuit, or in the alternative, a directed verdict, on the negligence cause of action, arguing in part that there was no evidence of causation on the negligence per se theory based on violation of the Patient's Bill of Rights.[9] The next day, May 3, after hearing the arguments of counsel, the trial court "agree[d] that the evidence of the theory [was] sparse," but concluded it was "colorable enough to deny the motion."

Shortly after denying the motion, the trial court instructed the jury, including, pursuant to CACI No. 400, that "plaintiff claims that she was

---

9       On May 3, the trial court indicated that "I have in front of me, two documents that were filed yesterday," including "defendant's motion for nonsuit . . . entitled in full motion for nonsuit as to plaintiff's cause of action for negligence, or in the alternative, motion for directed verdict." The written motion is not a part of the record.

harmed by Vibra Health Care's, Kentfield Hospital's and Kene O[r]leans' negligence." The record further indicates that the jury was provided a copy of California Code of Regulations, title 22, section 72527, and instructed, pursuant to CACI No. 418, that "If you decide that Vibra Health Care, Kentfield Hospital and/or Kene Orleans violated this law and that the violation was a substantial factor in bringing about the harm, then you must find that Vibra Health Care, Kentfield Hospital and/or Kene Orleans was negligent."[10] The jury was also instructed, pursuant to CACI No. 430, that "A

_____

10      The full instruction was as follows:

"The plaintiff claims that she was harmed by Vibra Health Care's, Kentfield Hospital's and Kene O[r]leans' negligence.

"To establish this claim, plaintiff must prove that Vibra Health Care's, Kentfield Hospital's and/or Kene Orleans'[s] were negligent, and that plaintiff was harmed and that Vibra Health Care, Kentfield Hospital, and/or Kene Orleans'[s] negligence was a substantial factor in causing plaintiff's harm.

"Negligence is the failure to use reasonable care to prevent harm to one's self or to others. A person can be negligent by acting or by failing to act.

"A person is negligent if he or she does something that a reasonably careful person would not do in the same situation or failed to do something that a reasonably careful person who [sic] do in the same situation.

"You must decide how a reasonably careful person would have acted in Vibra Health Care's, Kentfield Hospital's, or Kene Orleans'[s] situation.

"Every person has a right to expect that every other person would use reasonable care and would not violate the law, unless he or she knows or should know that the other person would not use reasonable care or would violate the law.

"Twenty-two, California Code of Regulations, Section 72527 will be provided to you and is attached to this particular instruction Number 418.

"If you decide that Vibra Health Care, Kentfield Hospital and/or Kene Orleans violated this law and that the violation was a substantial factor in bringing about the harm, then you must find that Vibra Health Care, Kentfield Hospital and/or Kene Orleans was negligent.

12

substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm."

Counsel then gave their closing arguments, which argument by plaintiff's counsel included a theory of negligence based on defendants' violation of the Patient's Bill of Rights. It included the following:

"Ms. Sharkey also testified about the Patient's Bill of Rights. And that was mentioned to you already, and I'll mention it later. It was mentioned by Judge Sweet. [¶] The Patient's Bill of Rights, set out the regulations passed by the State of California to make sure that patients in facilities like Kentfield Hospital are protected and that their rights are followed. [¶] And this makes sense. The state is there to make sure that patient dignity is respected. [¶] And Ms. Mace agreed that this is the requirement. And particularly the requirement that the Bill of Rights of patients requires a hospital like Kentfield to get the preference of the patient before it allows a male caregiver to treat that patient in an intimate way by himself. [¶] And again, Ms. Mace agreed that that's the requirement, and she claimed that Kentfield Hospital followed that requirement. [¶] But the evidence indicates on the contrary. And, in fact, there is no evidence that they followed that requirement. And the one person who can testify about that issue was Mr. Kranz. [¶] And you heard that Mr. Kranz was Ms. Sobalvarro's patient representative, dealt with the paperwork when she went to Kentfield, and he said they never asked him that question on her behalf. And you know they

---

"If you find that Vibra Health Care, Kentfield Hospital and/or Kene Orleans did not violate this law or that the violation was not a substantial factor in bringing about the harm, then you must still decide whether Vibra Health Care, Kentfield Hospital and/or Kene Orleans were negligent in light of the other instructions."

didn't ask her. [¶] And I bring that up at this early stage in what I have to say because I think it's true that if Kentfield Hospital had given Mr. Kranz the choice about whether Ms. Sobalvarro would be treated by a male caregiver or not, none of this would have happened. So this failure is critical to this case."

Closing arguments concluded on May 3.

The jury began its deliberations that afternoon, and they continued all day on May 4, during which the jury asked several questions and requested various materials, including a copy of the Patient's Bill of Rights. Deliberations resumed on the morning of May 8, and concluded that afternoon when the jury reached its verdict.

With respect to Orleans, the jury answered, "No" to each of the following: "Did Kene Orleans touch Jessica Duran Sobalvarro with intent to harm or offend her?," "Did Kene Orleans physically abuse Jessica Duran Sobalvarro?," and "Was Kene Orleans negligent?"

With respect to the other two defendants, the jury answered, "Yes" to each of the following: "Was [Vibra/Kentfield] negligent?," and "Was [Vibra's/Kentfield's] negligence a substantial factor in causing harm to Jessica Duran Sobalvarro?" The votes finding Kentfield and Vibra negligent were 12–0 and 11–1, respectively. And its votes that their negligence was a substantial factor in causing plaintiff's harm were both 11 to 1. The jury then awarded plaintiff $500,000 for "past . . . non-economic loss including physical and psychological, emotional distress, and mental suffering," and $500,000 for future such damages. [11]

---

[11] After the first reading of the verdict, polling of the jury revealed that nine jurors had failed to agree on the amount of either past or future non-economic damages. The trial court sent the jury back for further

14

On May 9, judgment was entered according to the special verdict.

### *Defendants' Motion for Judgment Notwithstanding the Verdict*

On May 24, Kentfield and Vibra filed notice of intention to move for partial judgment notwithstanding the verdict pursuant to Code of Civil Procedure 629, "due to lack of causation."[12]

Hearing on the motion was held on July 21, in advance of which the trial court had issued a tentative decision granting it. At the conclusion of the hearing, the trial court adopted its tentative decision as its final order. The trial court agreed with defendants' argument that the "only potential theory for Defendants' negligence is a violation of the Patients Bill of Rights," and noted that plaintiff argued that such violation was established by defendants' "fail[ure] to give her a choice of whether to receive care from a person of the opposite sex." With respect to causation, the trial court concluded as follows:

"While Plaintiff argues that there was evidence of Plaintiff's 'injury' through testimony of witnesses that Plaintiff was crying and in emotional distress on many occasions or that she appeared worried and sad and even relayed information to others that she was experiencing pain in her vagina or that 'something bad' happened to her at Kentfield Hospital, the nexus between that injury and causation is lacking as it applies to a negligence per se theory against Defendants. The gravamen of the case—that Plaintiff had

---

deliberations, after which they voted 11–1 in favor of $500,000 in past and $500,000 future non-economic damages reflected by the verdict.

[12] The memorandum of points and authorities in support is not in the record, nor is defendants' opposition, although the record does contain two declarations—one in support and one in opposition—attaching various portions of the trial testimony.

15

been sexually battered or physically abused by Mr. Orleans—and all supporting testimony regarding that harm—was negated by the jury's exoneration of Mr. Orleans, thus eliminating the possibility of Defendants' liability based on a theory of respondeat superior.

"Plaintiff's argument appears to attempt to transfer the harm she alleges she suffered from the touching by Mr. Orleans to Defendants. But the testimony elicited was offered as to her claims for sexual assault and battery, not in support of a theory of negligence per se.

" ' "Under the doctrine of negligence per se, the plaintiff 'borrows' statutes to prove duty of care and standard of care. [Citation.] The plaintiff still has the burden of proving causation." ' " (*David v. Hernandez* (2014) 226 Cal.App.4th 578, 584.)

"Defendants correctly assert that Plaintiff failed to present evidence of causation as it relates to a theory of liability for negligence or negligence per se against them. Plaintiff's own expert testified to the following:

"Q. . . . With regard to the opinions you formulated in this case, you have not formulated an opinion that the failure to comply with the standard of care, for whatever reasons you've articulated today, caused any damage, harm, or injury? In other words, you have no opinion on causation. Right?

"A. I cannot speak to causation. That's a doctor. [¶]

"Because there is insufficient evidence in the record to support the jury's verdict that Defendants' violation of the Patients Bill of Rights was the cause, or a substantial factor, of Plaintiff's alleged harm, the Court, accordingly, grants the JNOV. [Citation.]"

16

Judgment notwithstanding the verdict was entered for defendants, from which plaintiff filed a notice of appeal.[13]

## DISCUSSION

### Judgment Notwithstanding the Verdict and the Standard of Review

The trial court's power to grant a motion for judgment notwithstanding the verdict is the same as its power to grant a directed verdict, a power we have described as "severely limited." (*ENA North Beach, Inc. v. 524 Union St.* (2019) 43 Cal.App.5th 195, 210 (*ENA*), quoting *Teitel v. First Los Angeles Bank* (1991) 231 Cal.App.3d 1593, 1602; see Code Civ. Proc., § 629.) " ' " 'The trial judge cannot reweigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for [judgment notwithstanding the verdict] should be denied. [Citations.] "A motion for [judgment notwithstanding the verdict] of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party

---

[13] Defendants briefly argue that because plaintiff's notice of appeal checked the box indicating the appeal was from "an order after judgment under Code of Civil Procedure, section 904.1, [subdivision] (a)(2)" entered on July 26, it is defective, and that because plaintiff "fails to challenge the judgment that ultimately disposed of the case," the appeal must be dismissed. We will construe plaintiff's notice of appeal as being from the July 26 judgment, rather than the July 21 order granting defendants' motion, applying the "long-standing ' "law of this state that notices of appeal are to be liberally construed so as to protect the right of appeal if it is reasonably clear what [the] appellant was trying to appeal from, and where the respondent could not possibly have been misled or prejudiced." ' " (*K.J. v. Los Angeles Unified School District* (2020) 8 Cal.5th 875, 882; see Cal. Rules of Court, rule 8.100(a)(2) ["The notice of appeal must be liberally construed"]; *Ellis Law Group, LLP v. Nevada City Sugar Loaf Properties, LLC* (2014) 230 Cal.App.4th 244, 251 [finding notice of appeal sufficient even where the "wrong box was checked"].)

17

securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied." [Citation.]' " (*Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 877–878[, disapproved on other grounds in *Ryan v. Rosenfeld* (2017) 3 Cal.5th 124, 135], quoting *Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110–111.' " (*ENA, supra*, 43 Cal.App.5th at p. 210.)

"We review de novo a judgment notwithstanding the verdict applying the same legal standard as the trial court, bearing in mind that ' " '[t]he purpose of a motion for judgment notwithstanding the verdict is not to afford a review of the jury's deliberation but to prevent a miscarriage of justice in those cases where the verdict rendered is without foundation.' " ' " (*Reynolds v. Lau* (2019) 39 Cal.App.5th 953, 962, quoting *Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.* (2006) 144 Cal.App.4th 1175, 1194; see *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68 ["As in the trial court, the standard of [our] review is whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion"].)

"For evidence to be substantial, it must be of ponderable legal significance, reasonable, credible, and of solid value. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.) The 'focus is on the quality, not the quantity, of the evidence.' (*Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 871.) We resolve all evidentiary conflicts and indulge all reasonable inferences in support of the judgment. (*Leung v. Verdugo Hills Hospital* (2012) 55 Cal.4th 291, 308.)" (*Jorge v. Culinary Institute of America* (2016) 3 Cal.App.5th 382, 396; see *Reynolds v. Willson* (1958) 51 Cal.2d 94, 99 [we must "disregard[] conflicting evidence on behalf of the defendants and giv[e] to plaintiff's evidence all the value to

18

which it is legally entitled, therein indulging in every legitimate inference which may be drawn from that evidence"].)

**The Law of Causation**

As noted, the jury was instructed that in order to prove her negligence claim, plaintiff was required to show that defendants' negligence "was a substantial factor in causing [her] harm," and that "[a] substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm.  It must be more than a remote or trivial factor.  It does not have to be the only cause of the harm."  (See CACI Nos. 400, 430.)

As to this, our Supreme Court has explained that " '[t]he substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical.' " (*Bockrath v. Aldrich Chemical Co., Inc.* (1999) 21 Cal.4th 71, 79, quoting *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 978 (*Rutherford*).  The substantial factor standard "subsumes" and "generally produces the same results as does the 'but for' rule of causation which states that a defendant's conduct is a cause of the injury if the injury would not have occurred 'but for' that conduct."  (*Rutherford*, p. 969.)  And " '[l]egal causation is generally a question of fact to be determined by the jury . . . unless, as a matter of law, the facts admit of only one conclusion.' "  (*Whiteley v. Philip Morris Inc.* (2004) 117 Cal.App.4th 635, 694–695; see *Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205.)

**Substantial Evidence Supports the Jury Verdict**

Applying this law, we must ask—viewing the evidence in the light most favorable to plaintiff, and drawing every reasonable inference therefrom in her favor—whether there is substantial evidence in the record to support that

19

Kentfield's negligence was a substantial factor in causing Plaintiff's harm. And conclude there is.

To begin with, there is substantial evidence to support the finding—indeed, defendants do not dispute—that had Kentfield offered plaintiff the option of being cared for by a female nurse, she would have taken it. Upon admission to Kentfield, plaintiff was paralyzed and unable to move or speak, and as a result of her paralysis was incontinent and required daily intimate care, including "pericare" and bed baths, in order to keep her clean and avoid infection. As quoted, plaintiff's expert testified that women in plaintiff's position, when asked "do you mind if a male resident cleans you because you're incontinent or would you rather have a female . . . in my experience, 99 percent of the time . . . a female wants a female to clean her." Plaintiff's son Hamlet testified that, at least after plaintiff left Kentfield, she "didn't want to be" and "is not changed or cleaned by men." And had plaintiff been asked and requested a female nurse, substantial evidence supports the conclusion that she would have been assigned one, Mace herself admitting that Kentfield "was required to"—and did—"honor [such] requests."

As also quoted, referring to the harm to which Kentfield's negligence must be connected, the trial court concluded that such testimony "was offered as to [plaintiff's] claims for sexual assault and battery, not in support of a theory of negligence per se." While we do not disagree with the trial court that the "gravamen" of plaintiff's case was that she "had been sexually battered or physically abused by Mr. Orleans," viewing the evidence in the light most favorable to plaintiff, and drawing every inference in her favor, we cannot agree that her testimony does not "admit of only [the] conclusion" that no measure of her harm had to do with receiving intimate care from a male

nurse. (*Whiteley v. Philip Morris Inc.*, *supra,* 117 Cal.App.4th at pp. 694–695.)

When asked, "when you think about what happened to you at Kentfield Hospital, how does that make you feel?," plaintiff answered, "[v]iolated." And she responded, "Yes" when asked if she "think[s] about this every day." These answers were not cabined to Orleans's alleged misconduct; instead, they spoke to plaintiff's entire experience at Kentfield. And the testimony of plaintiff's ex-husband and sons that she was frequently crying while at Kentfield, that she "seemed worried, upset," and "looked very sad" was likewise not connected as a matter of law to the alleged conduct of Orleans. The jury could permissibly infer that some measure of plaintiff's undisputed emotional distress had to do with receiving daily intimate care, while paralyzed and unable to move or speak, over a lengthy period from a male nurse, contrary to her wishes, and as a direct result of Kentfield's negligence.

In resisting this conclusion, defendants rely, as did the trial court, on the jury's findings that Orleans did not "touch [plaintiff] with intent to harm or offend her," that he did not "physically abuse" her, and that he was not negligent—what the trial court called "the jury's exoneration of Mr. Orleans." But we cannot agree that these findings foreclose the possibility that Kentfield's negligence was the cause of some measure of plaintiff's harm.

To the contrary, while the jury's exoneration of Orleans meant that Kentfield was not negligent, for example, in hiring Orleans or in not disciplining him for some misconduct, after lengthy deliberations over several days, the jury unanimously found Kentfield negligent, and awarded plaintiff $1 million in damages. For something. And that something included the "sad[ness]," the "crying," and other distress manifest by plaintiff, who for the six months Orleans cared for her in her tragic situation lived with the fact

21

that each time he entered the room—the hundreds and hundreds of times he entered her room—he should not have been there. As plaintiff's lawyer succinctly put it in closing argument, "if Kentfield Hospital had given Mr. Kranz the choice about whether Ms. Sobalvarro would be treated by a male caregiver or not, none of this would have happened. So this failure is critical to this case." Indeed.

Further support for the conclusion that the trial court erred is found by an observation by the court itself, an observation made when the court denied defendants' motion for non-suit on the very negligence claim in issue here. As quoted above, the trial court denied the motion with the comment that the evidence was "sparse," an observation made when the evidence was fresh in the court's mind, the case still underway. Sparse is one thing. Sparse does not mean non-existent.

As plaintiff notes, her intentional tort claims contained requirements that the jury may have found were not satisfied in a way that does not foreclose her negligence claim against defendants.[14] Substantial evidence supports the conclusion that Orleans's duties included touching plaintiff in an intimate way, and that contrary to hospital policy, Orleans did so on several occasions while alone with plaintiff. What happened in those moments was a question of fact for the jury to decide. Perhaps Orleans was simply performing his job to the letter, in a way that plaintiff misunderstood or misinterpreted, because of her condition or otherwise. Perhaps Orleans,

---

[14] In particular, the jury was instructed that plaintiff's battery claim required proof that Orleans touched plaintiff "with the intent to harm or offend her," her assault claim required that he "acted intending to cause harmful contact," her sexual battery claim required that he "intended to cause a harmful touching or offensive contact with plaintiff's vagina," and her claim for abuse of a dependent adult required finding that "Orleans physically abused plaintiff by raping and digitally penetrating" her.

22

who according to his own testimony was so busy that he did not even have time to take his scheduled breaks, touched plaintiff inappropriately through inadvertence or mistake. For the purposes of our review, what matters is that substantial evidence supports the conclusion that none of it would have happened—or even been possible—but for the defendants' negligence.

Defendants make several arguments in support of the judgment notwithstanding the verdict. None is persuasive.

First, they invoke the rule that "[t]he pleadings are intended to define the issues to be tried." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2025) ¶ 6:8.) They go on to assert that "[a]ll of the causes of action asserted by Plaintiff are premised upon two alternative theories," either that they "enabled sexual abuse by Orleans," or were "vicariously liable for the sexual battery and/or sexual assault by Orleans," going on to cite four paragraphs of the complaint purportedly alleging these theories. The citation defendants provide with respect to the negligence cause of action does state that "[a]s a direct legal result of the negligence and carelessness of Defendants . . . [p]laintiff . . . was sexually assaulted and was injured." But just before the cited paragraph, the complaint alleges that "the VIBRA Defendants failed to exercise the degree of skill and care commonly required of General Acute Care Hospitals pursuant to Title 22 of the California Code of Regulations"; and just after it, alleges that "[a]s a further direct legal result of the negligence of Defendants . . . [plaintiff] was injured and suffered fear, anxiety, humiliation, physical pain and discomfort, and emotional distress . . . ." We cannot agree that the complaint provided a "complete lack of notice" to defendants that plaintiff alleged that she suffered harm as a result of their failure to abide by the requirements of the Patient's Bill of Rights. Moreover, if defendants thought

23

the allegations of the complaint insufficient to support their liability based on violation of plaintiff's Bill of Rights, it was incumbent upon them to so argue to the trial court. (See *Newton v. Clemons* (2003) 110 Cal.App.4th 1, 11 [" '[I]t is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court' "].) They did not make the argument below, not objecting when the court was settling the instructions, not objecting when plaintiff's counsel was making the argument quoted above.

Next, defendants invoke the well-settled rule " ' "that a party to an action may not, for the first time on appeal, change the theory of the cause of action," ' " but must instead "adhere to the theory (or theories) on which their cases were tried." (*Doe WHBE 3 v. Uber Technologies, Inc.* (2024) 102 Cal.App.5th 1135, 1152; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2025) ¶ 8:229 (Eisenberg).) The justification for this rule is that permitting a party to "change [her] position and adopt a new and different theory on appeal . . . would not only be unfair to the trial court, but manifestly unjust to the opposing litigant." (*Ernst v. Searle* (1933) 218 Cal. 233, 241; accord, *Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1350, fn. 12; see 9 Witkin, Cal. Procedure (6th ed. 2026) Appeal, §§ 428–429.)

We cannot agree that plaintiff has changed the theory of her negligence claim on appeal. As just noted, the theory was encompassed in plaintiff's complaint; Kranz and plaintiff's expert testified to the legal and factual underpinnings of the theory at trial; it was discussed as counsel and the court prepared the jury instructions; it was argued by plaintiff's counsel; and it was ultimately squarely addressed by version of CACI No. 418 given to the jury. The possibility that defendants would be found negligent but Orleans would

24

not was contemplated by the special verdict form, just as plaintiff's counsel argued.

Finally, defendants rely, as did the trial court, on the answer of plaintiff's expert, who, when asked whether she had "formulated an opinion that the failure to comply with the standard of care . . . caused any damage, harm, or injury," answered that "I cannot speak to causation. That's a doctor." But to the extent this testimony does not support plaintiff's claim, the standard of our review requires us to simply "disregard[]" it. (*Reynolds v. Willson, supra,* 51 Cal.2d at p. 99; see *Reynolds v. Lau, supra,* 39 Cal.App.5th at p. 963.)

In any event, and although defendants do not dispute the point, plaintiff was not required to present expert testimony in support of the causation element of her negligence cause of action. The question was not one of professional negligence, requiring expert testimony as to whether decisions of plaintiff's doctors deviated from the standard of care and thereby caused a worsening of her condition. It was simply whether the hospital's negligence in failing to offer plaintiff the choice of being cared for by a female nurse caused some measure of her emotional distress. The jury was well-equipped to answer this question, even without the benefit of expert testimony. (See *Kaney v. Custance* (2022) 74 Cal.App.5th 201, 217 ["if causation presents a question that is within the common knowledge of persons of ordinary education, then expert testimony is not required"].) Its answer is supported by substantial evidence, and the resulting judgment must therefore stand. The trial court erred in concluding otherwise.[15]

---

[15] Our conclusion makes it unnecessary for us to reach plaintiff's second argument, that the trial court erred in refusing to permit her to amend her expert witness disclosure shortly before trial.

25

## DISPOSITION

The July 26, 2023 judgment notwithstanding the verdict is reversed, and the trial court is directed to reinstate the judgment in conformance with the jury's special verdict. Plaintiff shall recover her costs on appeal.

_____

RICHMAN, J.

We concur.

_____

STEWART, P.J.

_____

MILLER, J.

(A168792P)

Superior Court of Marin County
Honorable Andrew E. Street, Judge

Counsel:

Seigel, Yee, Brunner & Mehta, Dan Siegel and Alan S. Yee for Plaintiff and Appellant.

Cole, Pedroza, Kenneth R. Pedroza, Dana L. Stenvick; Hinshaw, Marsh, Still & Hinshaw, Bradford Hinshaw, Patrick Colin Stokes, Christian Liang Goan for Defendants and Respondents.